**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**August 14, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

DIANE C. McINNIS,

      Plaintiff-Appellee/Cross-
      Appellant,

v.

FAIRFIELD COMMUNITIES, INC.,
d/b/a FAIRFIELD RESORTS, INC., a
Delaware corporation,

      Defendant-Appellant/Cross-
      Appellee.

Nos. 04-1343 & 04-1359

---

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 02-Z-0671 (BNB))**

---

K. Preston Oade Jr., (Timothy M. Reynolds with him on the brief) Holme Roberts
& Owen, LLP, Denver, Colorado, for Defendant-Appellant/Cross-Appellee.

Andrea J. Kershner, (Elwyn F. Schaefer with her on the brief) Elwyn F. Schaefer
& Assoc., P.C., Denver, Colorado, for Plaintiff-Appellee/Cross-Appellant.

---

Before **MURPHY, EBEL,** and **HARTZ**, Circuit Judges.

---

**EBEL**, Circuit Judge.

Plaintiff-Appellee/Cross-Appellant Diane C. McInnis ("McInnis") filed this employment discrimination suit against her former employer, Defendant-Appellant/Cross-Appellee Fairfield Communities, Inc., d/b/a Fairfield Resorts ("Fairfield"), claiming retaliation in violation of 42 U.S.C. § 2000e ("Title VII"). A jury found Fairfield liable and judgment was entered in her favor, awarding her $90,000 in back pay, $38,000 in compensatory damages, and $167,000 in punitive damages. The district court denied McInnis's request for front pay damages; ordered that "each party shall pay her or its own costs;" and awarded McInnis $189,103.75 in attorneys' fees, which was approximately half of the amount McInnis requested. Fairfield appeals from the judgment; McInnis cross-appeals from the denial of costs and front pay and from the order awarding reduced attorneys' fees. We AFFIRM on all appeal issues and REVERSE on all cross-appeal issues.

## BACKGROUND[1]

In 1985, McInnis began working for Fairfield in Pagosa Springs, Colorado. Fairfield is one of only two large employers in the area. From June 1998 to April

---

[1] We are taking the evidence and any inferences to be drawn therefrom in the light most favorable to McInnis because she prevailed before the jury. See Deters v. Equifax Credit Info. Servs., Inc., 202 F.3d 1262, 1269 (10th Cir. 2000); Baty v. Willamette Indus., Inc., 172 F.3d 1232, 1241 (10th Cir. 1999), overruled on other grounds by National R.R. Passenger Corp. v. Morgan, 536 U.S. 101 (2002).

1999, McInnis worked as the assistant to the Vice President of Sales and Operations at Pagosa Springs, Steve Thull. In April 1999, McInnis was promoted to Property Manager at Fairfield's site in Pagosa Springs. Thull maintained supervisory authority over McInnis after her promotion.

Shortly after her promotion, McInnis alleges that Thull began to sexually harass her. Thull's sexually aggressive behavior toward McInnis allegedly increased in severity, and McInnis claims that he raped her on several occasions. In March 2000, Thull was transferred to Las Vegas. Although this temporarily ended the day-to-day harassment, McInnis was instructed to contact Thull while on a business trip in Las Vegas, and Thull showed up at her hotel room and again allegedly raped her.

Months after his transfer to Las Vegas, Thull telephoned McInnis and told her he was returning to Fairfield in Pagosa Springs. McInnis started to cry, told him she could not take his harassment anymore and that she was going to tell someone at Fairfield. Thull became very angry and threatened to fire her if she told anyone. Soon after this conversation, Thull enlisted Michael Turolla, who had taken over Thull's position as Vice President of Sales at Pagosa Springs, and Ed Mikula, the Regional Human Resource Director, to retaliate against McInnis. Together, these three supervisors, especially Turolla, began interfering with

McInnis's ability to perform her job and documenting alleged problems with McInnis's performance.

In August 2000, McInnis's then-immediate supervisor, Kris Jamtaas, resigned, and, in November 2000, Mark Gray, the Senior Regional Vice President of Property Management in the western region, became McInnis's new immediate supervisor. On January 28, 2001, McInnis telephoned Gray at his home to complain about Thull's sexual harassment and Turolla's, Thull's, and Mikula's retaliation against her. After this phone call, Gray did not follow-up with McInnis about her complaint; instead, Gray started communicating with Turolla, Thull, and Mikula and joined in the retaliation against McInnis. When McInnis called Gray a second time to raise her sexual harassment and retaliation complaint, Gray became very angry with her and told her, "every rock I turn over, I find something on you." Gray also told her he "did not need this on [his] 90 day [probation period]." He then directed McInnis to report any past personnel issues to Mikula because "he [Gray] didn't want to get involved." At trial, Gray testified that he "didn't really want to know" or get involved with McInnis's complaint because it sounded like "some kind of an affair."

Gray apparently decided to terminate McInnis's employment after this second telephone call and thus contacted Mikula, in human resources, who requested documentation to support the termination. In the meantime, McInnis

also contacted Mikula, who told her to put her retaliation complaint in writing. While preparing this written complaint, McInnis sent a memorandum to Alex Fogel, the Vice President of Property Management, addressing Gray's retaliation and failure to respond to her complaint. Fogel immediately informed Gray by email of McInnis's complaint. Only hours after Fogel's email, Gray contacted McInnis by email and told her that he was "made aware of the memo [she] sent to [Fogel] regarding some concerns . . . [and in] response to those concerns, [would] be arriving in Pagosa Springs [the following day] and would like to schedule a meeting with [her]." The following day, Gray and Mikula met with McInnis, and Gray terminated her employment.

## DISCUSSION

### I. Fairfield's Appeal Issues

Fairfield has appealed on several issues: it claims that district court erred in 1) denying its Fed. R. Civ. P. 50 motions for judgment as a matter of law on the issue of punitive damages; 2) refusing its proposed jury instruction; and 3) excluding as hearsay emails written by one of Fairfield's managers. We affirm the district court's decision on each of these issues.

#### A. Punitive Damages

We review the sufficiency of the evidence to support a punitive damages award de novo. See Deters, 202 F.3d at 1269. We also review a district court's

disposition of a motion for judgment as a matter of law <u>de novo</u>. <u>See</u> <u>Baty</u>, 172

F.3d at 1241.

> Such a judgment is warranted only if the evidence points but one way and is susceptible to no reasonable inferences supporting the party opposing the motion. We do not weigh the evidence, pass on the credibility of the witnesses, or substitute our conclusions for those of the jury. However, we must enter judgment as a matter of law in favor of the moving party if there is no legally sufficient evidentiary basis with respect to a claim or defense under the controlling law. We must view the evidence and any inferences to be drawn therefrom most favorably to the non-moving party.

<u>Id.</u> (citations, quotations, alterations omitted); <u>see also</u> Fed. R. Civ. P. 50(a).

A Title VII plaintiff is entitled to punitive damages if his or her employer engaged in discriminatory practices "with malice or with reckless indifference to [her] federally protected rights." 42 U.S.C. § 1981a(b)(1). "Malice" or "reckless indifference" do not require "a showing of egregious or outrageous" conduct, but instead require proof that the employer acted "in the face of a perceived risk that its actions [would] violate federal law." <u>Kolstad v. Am. Dental Ass'n</u>, 527 U.S. 526, 535-36 (1999). An employer may be either directly or vicariously liable for the malicious or recklessly indifferent acts of its officers and employees.

An employer is vicariously (or indirectly) liable for compensatory damages when "a supervisor with immediate (or successively higher) authority over the employee" perpetrates the Title VII violation. <u>See</u> <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 807 (1998), and <u>Burlington Indus., Inc. v. Ellerth</u>, 524 U.S.

742, 765 (1998); see also Deters, 202 F.3d at 1270 n. 3.  Because "it is 'improper ordinarily to award punitive damages against one who himself is personally innocent and therefore liable only vicariously,'" Kolstad, 527 U.S. at 544 (quoting Restatement (Second) of Torts, § 909, cmt. b), "before a company is held liable for punitive damages for acts of harassment by low-level employees, there [must] be some culpability beyond mere negligence at the management level," Danco, Inc. v. Wal-Mart Stores, Inc., 178 F.3d 8, 18 (10th Cir. 1999) (first emphasis in original; second emphasis added).  Thus, an employer is vicariously liable for punitive damages "where an employee serving in a 'managerial capacity' committed the wrong while 'acting in the scope of employment.'"  Kolstad, 527 U.S. at 543.[2]  However, "in the punitive damages context, an employer may not be vicariously liable for the [violative] decisions of managerial agents where th[o]se

---

[2] Although the Supreme Court has not defined "managerial capacity," it explained that "determining whether an employee meets this description requires a fact-intensive inquiry" in which the court "should review the type of authority that the employer has given to the employee, the amount of discretion that the employee has in what is done and how it is accomplished."  Kolstad, 527 U.S. at 543.  The employee "need not be the employer's top management, officers, or directors, to be acting in a managerial capacity," although the employee must be "important."  Id. (quotations, citations omitted).

An employee may be said to act within the scope of employment if the employee's conduct "is 'the kind the employee is employed to perform,' 'occurs substantially within the authorized time and space limits,' and 'is actuated, at least in part, by a purpose to serve the' employer."  Id. at 543-44 (quoting Restatement (Second) of Agency, § 228(1)).

decisions are contrary to the employer's good faith efforts to comply with Title VII." Id. at 545 (quotations omitted); see also Deters, 202 F.3d at 1271.[3]

Here, the evidence was sufficient to support the jury's punitive damages award under a vicarious liability theory because managerial employees within Fairfield maliciously and recklessly retaliated against McInnis for reporting sexual harassment.[4] Specifically, the evidence indicates that after McInnis first

_____

[3] This has come to be known as the "good faith" or "Kolstad" defense to punitive damages. We have not yet decided whether this so-called "defense" "represents an affirmative defense on which the defendant bears the burden of proof or whether the plaintiff must disprove the defendant's good faith compliance with Title VII." Davey v. Lockheed Martin Corp., 301 F.3d 1204, 1209 (10th Cir. 2002) (quotations omitted). A number of other courts have determined that the defense is an affirmative one and place the burden to establish it on the defendant. See Zimmerman v. Assoc. First Capital Corp., 251 F.3d 376, 385 (2d Cir. 2001); Romano v. U-Haul, Int'l, 233 F.3d 655, 670 (1st Cir. 2000); Passantino v. Johnson & Johnson Consumer Prods., Inc., 212 F.3d 493, 516 (9th Cir. 2000); Deffenbaugh-Williams v. Wal-Mart Stores, Inc., 188 F.3d 278, 286 (5th Cir. 1999). We need not resolve this issue in deciding whether judgment as a matter of law was warranted in this case because our result would be the same under either standard.

[4] We therefore do not address whether the evidence would also support the punitive damages award under a direct liability theory. Direct liability, unlike vicarious liability, is premised on a party's own malfeasance. Because a corporation "can only act through its officers and employees," Magnum Foods, Inc. v. Cont'l Cas. Co., 36 F.3d 1491, 1499 (10th Cir. 1994), were we to address direct liability in this case, we would need to resolve the issue of what level of employment is equivalent to "management-level." See Deters, 202 F.3d at 1270 (noting that "employer malice or reckless indifference in failing to remedy or

(continued...)

complained to Gray about Thull's sexual harassment and Turolla's, Thull's, and Mikula's retaliation, Gray began retaliating against her by interfering with her ability to perform her job and documenting alleged problems with McInnis's performance that had not previously existed. After McInnis's second complaint to Gray, he told her that he did not want to get involved and almost immediately thereafter decided to terminate her employment. Then, the day after Gray discovered that McInnis complained to Fogel, the Vice President of Property Management, about Gray's retaliation and his failure to respond to her complaint, Gray scheduled a meeting with McInnis and Mikula and immediately terminated McInnis's employment. Based on this evidence, a reasonable jury could find that McInnis's termination was illegal retaliation against her federally protected rights for reporting sexual harassment.

---

[4](...continued)
prevent a hostile or offensive work environment of which management-level employees knew or should have known is premised on direct liability") (emphasis added). We recognize that some of our cases seem to inconsistently define which employees are sufficiently highly ranked to hold an employer directly liable at all, as well as to inconsistently define which employees are sufficient to hold an employer directly liable for compensatory and punitive damages. Because this issue was not adequately briefed, and because it is unnecessary to decide whether judgment could be predicated on direct liability, we do not resolve these issues today. Compare Deters, 202 F.3d at 1269-71; Fitzgerald v. Mountain States Tel. & Tel. Co., 68 F.3d 1257, 1264 (10th Cir. 1995); with Lockard v. Pizza Hut, Inc., 162 F.3d 1062, 1074 (10th Cir. 1998); Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 674 (10th cir. 1998); Wilson v. Tulsa Junior College, 164 F.3d 534, 542 (10th Cir. 1998); Jeffries v. Kansas, 147 F.3d 1220, 1229 n.7 (10th Cir. 1998), abrogated on other grounds by Ellerth, 524 U.S. 742 (1988); Sauers v. Salt Lake County, 1 F.3d 1122, 1125 (10th Cir. 1993).

As Fairfield acknowledges, it regularly trained its employees concerning Title VII's prohibitions against harassment and retaliation. In fact, Turolla testified that the training was "mandatory." More importantly, Gray specifically testified that he understood that employees have a right to complain formally or informally about sexual harassment. A reasonable jury could therefore have concluded that at least one managerial agent, the Senior Regional Vice President of Property Management for the western region, was aware of the relevant federal prohibitions and nevertheless retaliated against McInnis. By terminating McInnis's employment in retaliation for reporting sexual harassment "in the face of a perceived risk that [such] actions w[ould] violate federal law," Kolstad, 527 U.S. at 543, the jury could reasonably have found Fairfield vicariously liable in punitive damages.

Fairfield argues that punitive damages were nevertheless not warranted because 1) it made good-faith efforts to comply with Title VII; and 2) McInnis failed to follow Fairfield's complaint procedure. We reject both of these arguments.

### 1. Kolstad defense

To avail itself of Kolstad's good-faith-compliance standard, an employer must at least 1) "adopt antidiscrimination policies;" 2) "make a good faith effort to educate its employees about these policies and the statutory prohibitions"; and

3) make "good faith efforts to <u>enforce</u> an antidiscrimination policy." <u>Cadena v. Pacesetter Corp.</u>, 224 F.3d 1203, 1210 (10th Cir. 2000) (quotations omitted) (emphasis in original). Fairfield contends that it maintained a written policy against discrimination and retaliation.[5] While there is some debate regarding whether Fairfield demonstrated good-faith efforts to educate its employees about its specific policies, we need not address that issue because the jury could have reasonably concluded that Fairfield failed to enforce, or make good-faith efforts to enforce, any antidiscrimination policies it adopted. We have previously explained that, "even if an employer[] adduces evidence showing it maintains on paper a strong non-discrimination policy and makes good faith efforts to educate its employees about that policy and Title VII, a plaintiff may still recover punitive damages if she demonstrates the employer failed to adequately address Title VII violations of which it was aware." <u>Cadena</u>, 224 F.3d at 1210.

Here, the evidence indicates that, in December 1999, McInnis complained to Jamtaas, her then-immediate supervisor, about Thull's sexually harassing behavior. Although Jamtaas contacted Thull about McInnis's complaint, he never

---

[5] An additional problem for Fairfield's position in this regard is that it maintained procedures only for reporting <u>sexual harassment</u>. Here, the jury found Fairfield liable for <u>retaliation</u>, and none of Fairfield's policies make any reference to procedures for reporting retaliation, although Fairfield's policies prohibited retaliation as well as sexual harassment.

followed up with McInnis and later made light of her complaint.[6]  In January 2001, McInnis called Gray, her immediate supervisor at the time, to complain about Thull's sexual harassment and Turolla's, Thull's, and Mikula's retaliation against her.  Gray told McInnis that "[she] [could] always look at something different, when you step away from it, out of sight and out of mind" and that McInnis "needed to not let emotions take over."  After this phone call, Gray did not follow-up with McInnis about her complaint.  McInnis called Gray a second time to raise her sexual harassment and retaliation complaint.  During this conversation, Gray told McInnis that after their first telephone call, he talked to Thull, Mikula, and Fogel about her complaint.  Gray then told McInnis that he "did not need this on [his] 90 day [probation period]."  He directed McInnis to report any past personnel issues to Mikula because he did not want to get involved.  McInnis then contacted Mikula to complain about being harassed and retaliated against, and he instructed her to put her retaliation complaint in writing.

---

[6] In his farewell letter to McInnis after resigning from Fairfield, Jamtaas wrote:

> And finally Diane . . . I have to thank you for providing me a safe haven during all of my visits to Pagosa Springs.  I can honestly say that I was truly an angel during each of my many visits with you and your team.  Of course it had nothing to do with the fact that I knew that if I ever even looked any of your staff eye-to-eye after hours that I would be hit with a harassment suite [sic] before I could blink!  There is something in the water up there!

- 12 -

While preparing this written complaint, McInnis sent a memorandum to Fogel complaining of Gray's retaliation and his failure to respond to her complaint. Fogel then contacted Gray by email and informed him of McInnis's complaint.

In short, the evidence in this case indicates that between December 1999 and February 2001, McInnis reported harassment and retaliation to at least the Senior Regional Vice President of Property Management, the Vice President of Property Management, and the Regional Human Resource Director, all of whom failed to take any action to remedy the situation or stop the retaliation.[7] "Because sufficient evidence was presented on which a jury could have found [Fairfield] did not make good faith efforts to comply with Title VII, this court will not enter judgment as a matter of law in favor of [Fairfield] on the question of punitive damages." Cadena, 224 F.3d at 1210.

## 2. Compliance with complaint procedures

Fairfield also contends that punitive damages were not warranted because McInnis failed to follow Fairfield's complaint procedure. Under Faragher and

---

[7] The Seventh Circuit has expressed concern that the Kolstad good faith defense could never be employed in a vicarious liability case if the harasser's (or retaliator's) knowledge of the harassment (or retaliation) were imputed to the employer. See Cooke v. Stefani Mgmt. Servs., Inc., 250 F.3d 564, 569 (7th Cir. 2001). Although we recognize the basis of this concern, it does not affect our decision in this case because Fogel, the Vice President of Property Management, in addition to Gray, Mikula, Turolla, and Thull, was informed of the harassment and retaliation.

- 13 -

Ellerth, an employer is shielded from vicarious liability for Title VII violations where no tangible employment action was taken against the employee if it can prove a two-pronged affirmative defense: 1) "the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior," and 2) the plaintiff "unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise." Faragher, 524 U.S. at 807; Ellerth, 524 U.S. at 765. Fairfield acknowledges that it is not entitled to the Faragher/Ellerth defense because terminating McInnis's employment constituted a tangible employment action; however, it urges us to adopt a new rule precluding punitive damages where an employee fails to follow known procedures for reporting Title VII violations.

None of the cases cited by Fairfield in support of their position, Williams v. Missouri Dep't of Mental Health, 407 F.3d 972 (8th Cir. 2005), cert. denied, 74 U.S.L.W. 3390 (U.S. Jan 09, 2006) (NO. 05-515); Cooke v. Stefani Mgmt. Servs., 250 F.3d 564 (7th Cir. 2001); and Williams v. Trader Publ'g Co., 218 F.3d 481 (5th Cir. 2000), adopt or apply the rule Fairfield urges us to adopt. More importantly, unlike the Faragher/Ellerth doctrine, Kolstad does not depend on the actions of the plaintiff but merely requires that the employer demonstrate it made "good-faith efforts to prevent discrimination in the workplace." Kolstad, 527 U.S. at 546; see also Cadena, 224 F.3d at 1210 (describing the acts an employer

- 14 -

must take to be shielded from vicarious punitive damages liability without any reference to actions (or inactions) by the plaintiff). The Supreme Court thus did not impose a requirement that an employee follow known procedures for reporting harassment or retaliation in order to receive punitive damages.

In any event, although Fairfield contends otherwise, sufficient evidence exists for the jury to have found that McInnis followed Fairfield's complaint procedures. Fairfield's Employee Handbook directed employees to report harassment to their supervisor.[8] Fairfield does not dispute that Gray was McInnis's supervisor.[9] Thus, when McInnis informed Gray of Thull's sexual

---

[8] The "Fairfield Communities, Inc. Employee Handbook" directed that:

If an employee believes he/she is the subject of sexual harassment, the employee must report the alleged act(s) within forty-eight (48) hours to his or her supervisor. If the supervisor is unavailable or the employee is uncomfortable contacting the supervisor, the employee should immediately contact the Vice President of Human Resources. Employees can raise concerns and make reports without fear of reprisal.

. . .

Any supervisor or manager who becomes aware of possible sexual or other unlawful harassment must promptly advise the Vice President of Human Resources who will handle the matter in a timely and confidential manner.

[9] Fairfield instead contends that its "Sexual Harassment Policy," revised in March 1998, changed the complaint procedure to require that employees "report the alleged act(s) [of sexual harassment] within forty eight (48) hours to the local general manager or, if you are not comfortable with this reporting arrangement,

(continued...)

- 15 -

harassment and Turolla's, Thull's, and Mikula's retaliation, she complied with Fairfield's complaint policies.

## B. Refused Proposed Jury Instruction

In its second issue on appeal, Fairfield claims it was prejudiced by the district court's erroneous refusal to give the jury the following tendered instruction: "Fear of retaliation is not a legitimate reason for failure to use a reasonable and available procedure for reporting alleged harassment." It argues that the district court's refusal to give this instruction allowed the jury to ignore McInnis's failure to follow Fairfield's policy and likely nullified Fairfield's good-faith Kolstad defense to punitive damages. We disagree.

"We review for abuse of discretion a district court's decision not to give a tendered jury instruction." Quigley v. Rosenthal, 327 F.3d 1044, 1062 (10th Cir. 2003). "In doing so, we also consider the instructions as a whole de novo to determine whether they accurately informed the jury of the governing law." Id.

---

[9](...continued)
you can contact Paul Tocash . . . or Marilyn Calva . . . in the Corporate Human Resources Department." McInnis testified, however, that she received the Employee Handbook, which directed her to report harassment to her supervisor, in 1999, which is after the Sexual Harassment Policy allegedly amended Fairfield's reporting procedure. We do "not make credibility determinations or weigh the evidence" when reviewing a motion for judgment as a matter of law. Loughridge v. Chiles Power Supply Co., 431 F.3d 1268, 1280 (10th Cir. 2005). Language in Fairfield's Employee Handbook supports a determination that Fairfield's sexual harassment policy instructed employees to inform their supervisor of allegations of sexual harassment. Notwithstanding other evidence, we accept evidence favorable to McInnis.

- 16 -

(quotations omitted). "[F]aulty jury instruction[s] require[] reversal when (1) we have substantial doubt whether the instructions, considered as a whole, properly guided the jury in its deliberations; and (2) when a deficient jury instruction is prejudicial." Townsend v. Lumbermens Mut. Cas. Co., 294 F.3d 1232, 1242 (10th Cir. 2002) (quotations, citations omitted).

The instruction tendered by Fairfield appears to be a correct statement of federal law for purposes of applying the Faragher/Ellerth defense. See Harrison v. Eddy Potash, Inc., 248 F.3d 1014, 1026 (10th Cir. 2001) (recognizing a similar proposed jury instruction to be a correct statement of federal law); see also Barrett v. Applied Radiant Energy Corp., 240 F.3d 262, 267 (4th Cir. 2001) (stating, in the context of the Faragher/Ellerth defense, that "[a] generalized fear of retaliation does not excuse a failure to report sexual harassment"); Shaw v. AutoZone, Inc., 180 F.3d 806, 813 (7th Cir. 1999) ("[A]n employee's subjective fears of confrontation, unpleasantness or retaliation do not alleviate the employee's duty under Ellerth to alert the employer to the allegedly hostile environment."). But the Faragher/Ellerth defense does not apply in cases where the employer takes an adverse employment actions; here, Fairfield terminated McInnis's employment.[10] See Harrison, 248 F.3d at 1024. It was not an abuse of

_____

[10] McInnis urges us to hold in this appeal that the Faragher/Ellerth defense never applies to a retaliation case because the defense does not apply when the employee suffered a "tangible employment action" and retaliation under
(continued...)

discretion for the district court to refuse to give a proper instruction on an irrelevant issue. The district court's instructions properly conveyed to the jury the issues to be decided.[11]

## C. Excluded Emails

---

[10](...continued)
Tenth Circuit case law requires an adverse employment action. Hillig v. Rumsfeld, 381 F.3d 1028, 1031 (10th Cir. 2004) ("One element of a prima facie case under Title VII is that the plaintiff suffered an 'adverse employment action.'"). The Supreme Court, however, recently held that a retaliation claim does not require proof of an adverse employment action. See Burlington N. & Santa Fe Ry. Co. v. White, — U.S. — , 126 S. Ct. 2405, 2414-15 (2006); see also Argo v. Blue Cross & Blue Shield of Kan., Inc., — F.3d — , 2006 WL 1806605, at *7 (10th Cir. 2006).

[11] With regard to punitive damages, the district court instructed the jury, in relevant part, as follows:

> If you find in favor of Plaintiff on her claim of retaliation, then you must decide whether defendant acted with malice or reckless indifference to Plaintiff's right not to be retaliated against. Defendant acted with malice or reckless indifference if it has been proved by the preponderance of the evidence that the person or persons who terminated Plaintiff's employment knew that the termination was in violation of the law prohibiting retaliation for engaging in protected activity, or acted with reckless disregard of that law.

Although this instruction does not precisely track the Supreme Court's language in Kolstad, it does not appear that Fairfield challenged it before the district court, and it does not argue on appeal that this instruction improperly informed the jury of the governing law. See 10th Cir. R. 28.2(C)(3)(b) (noting that "[b]riefs must cite the precise reference in the record where a required objection was made and ruled on, if the appeal is based on . . . the giving of or refusal to give a particular jury instruction"); 10th Cir. R. 10.1(A)(1) ("The appellant must provide all portions of the transcript necessary to give the court a complete and accurate record of the proceedings related to the issues on appeal.").

We review a district court's evidentiary rulings for an abuse of discretion. United States v. Visinaiz, 428 F.3d 1300, 1313 (10th Cir. 2005), cert. denied, 74 U.S.L.W. 3393 (U.S. Jan. 9, 2006) (No. 05-7839). "We will not overturn an evidentiary ruling absent a distinct showing that it was based on a clearly erroneous finding of fact or an erroneous conclusion of law or manifests a clear error of judgment." Id. (quotations omitted). Even assuming the district court abused its discretion in excluding evidence, we must also determine whether the exclusion was harmless error because "we will not set aside a jury verdict unless the error prejudicially affects a substantial right of a party." Praseuth v. Rubbermaid, Inc., 406 F.3d 1245, 1253 (10th Cir. 2005). "An error affecting a substantial right of a party is an error which had a 'substantial influence' or which leaves one in 'grave doubt' as to whether it had such an effect on the outcome." United States v. Sarracino, 340 F.3d 1148, 1171 (10th Cir. 2003) (citing Kotteakos v. United States, 328 U.S. 750 (1946)). "When conducting our harmless error analysis, we review the record as a whole." Id. (quotations omitted).

At trial, Fairfield offered a series of emails written by Turolla as evidence of Turolla's state of mind and to rebut McInnis's charge that his complaints against her were motivated by a desire to retaliate. The district court refused to

admit the emails on the ground that they were inadmissible hearsay, which

Fairfield contends was prejudicial error. We disagree with Fairfield's contention.

### 1. Whether the district court erred

Fairfield contends that the emails were admissible 1) under Fed. R. of Evid.

801(d)(1)(B) as prior consistent statements, 2) as nonhearsay, 3) under Fed. R.

Evid. 803's state of mind exception, or 4) under the Best Evidence Rule.

### a. Prior consistent statements

Fed. R. of Evid. 801(d)(1)(B) provides that a statement is not hearsay if:

> The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is . . . consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive.

The Supreme Court has held that this rule "permits the introduction of a

declarant's consistent out-of-court statements to rebut a charge of recent

fabrication or improper influence or motive only when those statements were

made before the charged recent fabrication or improper influence or motive."

Tome v. United States, 513 U.S. 150, 167 (1995) (emphasis added). Under this

requirement, then, Turolla's prior consistent statements are inadmissable hearsay

unless he made them before his improper motive arose. See United States v.

Albers, 93 F.3d 1469, 1482 (10th Cir. 1996).

According to McInnis, Turolla's improper motive arose in September 2000, immediately after the telephone call between her and Thull and once Thull again became Turolla's direct boss. Prior to that conversation, McInnis had no documented performance issues. The record indicates that, after that telephone call and upon Thull's return to Pagosa Springs, Turolla informed McInnis that he had spoken with Thull about her and Turolla's attitude toward her changed abruptly after that conversation. The emails offered by Fairfield are dated October 17, October 31, and November 4, 2000. Thus, the premotive requirement for prior consistent statements was not met because the emails were written after the conflict between Turolla and McInnis arose. The district court therefore did not abuse its discretion by refusing to admit the emails as prior-consistent statements.

**b.  Nonhearsay because not offered for the truth of the matter asserted but merely to show Fairfield's state of mind**

Fairfield alternatively argues that the emails were admissible as nonhearsay to show its agents' states of mind in making the decision to discharge McInnis and not to prove the truth of the matter asserted in the emails. We have

previously held that out-of-court statements may properly be admitted to show an employer's state of mind in making employment decisions. See Faulkner v. Super Valu Stores, Inc., 3 F.3d 1419, 1434-35 (10th Cir. 1993) (holding admissible certain out-of-court statements which were "offered to establish [defendant's] state of mind in making its hiring decisions and [were] not offered for the truth of the matter asserted"); see also Staniewicz v. Beecham, Inc., 687 F.2d 526, 530-31 (1st Cir. 1982) (permitting, in an age discrimination case, the supervisor to testify as to conversations with third parties about plaintiff because "they were offered to show [the supervisor's] intent in calling the meeting with [the plaintiff] which ultimately resulted in the resignation of [plaintiff]"); Haddad v. Lockheed Cal. Corp., 720 F.2d 1454, 1456 (9th Cir. 1983) (permitting, in an age and national origin discrimination case, management witnesses to testify about complaints received about plaintiff because the testimony "was relevant in demonstrating [the employer's] non-discriminatory intent in its employment practices"). Turolla's emails, however, were only sent to Thull or Mikula or both. Neither of these men made the decision to termination McInnis. As a result, the statements were inadmissible to show Fairfield's state of mind in discharging McInnis because there is no evidence the decision-maker responsible for McInnis's termination—Gray—ever read or learned of the contents of the emails.

### c. Rule 803(3) state of mind exception

Fairfield also argues that the emails were admissible under Fed. R. Evid. 803(3), the state of mind exception to the general hearsay rule.[12] That Rule expressly excludes from the exception "a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will." Fed. R. Evid. 803(3). Based on this limitation to the exception, we have held that 803(3) "does not permit the witness to relate any of the declarant's statements as to why [the declarant] held the particular state of mind, or what [the declarant] might have believed that would have induced the state of mind." United States v. Joe, 8 F.3d 1488, 1493 (10th Cir. 1993).

Turolla's emails contain hearsay statements expressing his then existing state of mind (i.e., "I hate to be in this predicament;" "I am at my wits end;" "I am concerned for the future") as well as assertions of why Turolla had these feelings (i.e., descriptions of conversations, interactions, incidents, and problems he was allegedly having with McInnis). The statements explaining why Turolla had these feelings are expressly outside the state-of-mind exception.[13] See Joe, 8

---

[12] Rule 803(3) provides that "statement[s] of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health)" are "not excluded by the hearsay rule, even though the declarant is available as a witness." Fed. R. Evid. 803(3).

[13] To the extent the statements of memory or belief were not offered to
(continued...)

F.3d at 1493 (holding that victim's hearsay statement that she was "afraid sometimes" was admissible under Rule 803(3) but that remainder of statement indicating "why she was afraid" was "clearly a statement of memory or belief" and "was not admissible under Rule 803(3)") (emphasis in original); United States v. Tome, 61 F.3d 1446, 1453-54 (10th Cir. 1995) (holding that a child's statements that she did not want to return to her father "because my father gets drunk and he thinks I'm his wife" were not a state-of-mind expression because the first statement was not an expression of fear and the second was a "statement of memory to prove the fact remembered"); see also Fed. R. Evid. 803(3) advisory committee's note ("The exclusion of 'statements of memory or belief to prove the fact remembered or believed' is necessary to avoid the virtual destruction of the hearsay rule which would otherwise result from allowing state of mind, provable by a hearsay statement, to serve as the basis for an inference of the happening of the event which produced the state of mind.").

Fairfield does not argue, nor does the evidence suggest, that Fairfield offered to redact the inadmissible portion of the emails. Nevertheless, to the extent that the court abused its discretion by not admitting the emails in redacted

---

[13](...continued)
prove the fact remembered or believed, they are irrelevant because, as discussed earlier, Turolla did not make the decision to terminate McInnis and there is no evidence that Gray ever read or learned of the contents of the emails.

form, any error did not prejudice Fairfield for the reasons described more fully below.

### d. Best Evidence Rule

Finally, Fairfield argues that the exclusion of Turolla's emails prevented it from presenting "the best evidence of his true motive." Fed. R. Evid. 1002, known as the best evidence rule, states that "[t]o prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required, except as otherwise provided in these rules or by Act of Congress." The best evidence rule is <u>not</u> an exception to the general rule excluding the admission of hearsay. Instead,

> [w]hile Rule 1002 limits the admissibility of evidence offered to prove the contents of a writing . . . satisfying Rule 1002 does not mean that the evidence in question is necessarily admissible. The evidence remains subject to other admissibility objections under the Evidence Rules and the Constitution. Specifically, the evidence frequently also raises admissibility issues under the rules regulating hearsay and authentication.

31 Charles A. Wright and Victor J. Gold, <u>Federal Practice and Procedure</u> § 7183 (2000) (footnotes omitted). Therefore, Fairfield's claim that the emails are the best evidence of Turolla's motivation does not support its argument that the district court abused its discretion by excluding that evidence as hearsay.

### 2. Whether any error was prejudicial

Assuming exclusion of the emails, in whole or in part, was erroneous, their exclusion did not prejudice Fairfield. Turolla testified at length about his state of mind, his alleged nonretaliatory motive, and his problems with McInnis's performance, which is the same subject matter contained in the excluded emails. There is no indication that Fairfield's substantial rights were affected by the district court's refusal to admit the actual documents into evidence. See Polys v. Trans-Colorado Airlines, Inc., 941 F.2d 1404, 1407 n.3 (10th Cir. 1991) (recognizing that a district court's error in excluding evidence is harmless if the excluded evidence would not have added anything new to the evidence already presented or if the outcome of the trial would have been the same if the excluded evidence had been admitted).

Accordingly, we hold that it was not an abuse of discretion for the district court to exclude the emails, and that, even if it was, any error did not prejudice Fairfield's rights because the author testified to the substance of the excluded emails. We therefore affirm the district court's exclusion of this evidence.

## II. McInnis's Cross-Appeal Issues

McInnis has cross-appealed, challenging the district court's costs, front pay, and attorneys' fees awards. Reviewing each award for an abuse of discretion, see Rodriguez v. Whiting Farms, Inc., 360 F.3d 1180, 1190 (10th Cir. 2004) (costs); Smith v. Diffee Ford-Lincoln-Mercury, Inc., 298 F.3d 955, 964

(10th Cir. 2002) (front pay); <u>Chavez v. Thomas & Betts Corp.</u>, 396 F.3d 1088, 1102 (10th Cir. 2005) (attorneys' fees), we reverse.

## A. Costs

The district court ordered "each party shall pay her or its own costs" without providing any reason for its decision. McInnis requested that the court alter or amend its order and award her costs, but the district court also denied that motion without explanation. In <u>Cantrell v. International Board of Electric Workers, Local 2021</u>, 69 F.3d 456 (10th Cir. 1995) (en banc), we held that a district court's discretion under Fed. R. Civ. P. 54(d)[14] is restrained in that "it must provide a valid reason for not awarding costs to a prevailing party." <u>Id.</u> at 459; <u>see also</u> <u>Rodriguez</u>, 360 F.3d at 1190. Fairfield does not dispute that McInnis was the prevailing party and does not object to a remand on this issue in light of <u>Cantrell</u>. We agree with the parties that remand is appropriate so that the district court may make the required findings and provide a valid reason for denying McInnis costs should it decide on remand to do so; however, we note that

---

[14] Fed. R. Civ. P. 54(d) provides in relevant part:

Except when express provision therefor is made either in a statute of the United States or in these rules, costs other than attorneys' fees shall be allowed as of course to the prevailing party unless the court otherwise directs.

"Rule 54 creates a presumption that the district court will award the prevailing party costs." Rodriguez, 360 F.3d at 1190.

### B. Front Pay

McInnis also appeals the district court's denial of front pay damages. "Front pay is simply money awarded for lost compensation during the period between judgment and reinstatement or in lieu of reinstatement" to make the plaintiff whole. Abuan v. Level 3 Commc'n, Inc., 353 F.3d 1158, 1176 (10th Cir. 2003) (alteration, quotations, citation omitted). Although reinstatement is the preferred remedy under Title VII, it "may not be appropriate . . . when the employer has exhibited such extreme hostility that, as a practical matter, a productive and amicable working relationship would be impossible." E.E.O.C. v. Prudential Fed. Sav. and Loan Ass'n, 763 F.2d 1166, 1172 (10th Cir. 1985); see also Fitzgerald v. Sirloin Stockade, Inc., 624 F.2d 945, 957 (10th Cir. 1980) (holding that denial of reinstatement was appropriate in a Title VII case where there was an atmosphere of hostility). Here, reinstatement was not a suitable

option.[15]  As the district court found, "it would be devastating to the plaintiff to be reinstated with Fairfield."

"The amount [of front pay], if any, is set in the court's discretion." Whittington v. Nordam Group Inc., 429 F.3d 986, 1000 (10th Cir. 2005).  The following factors are relevant in assessing such an award:

> work life expectancy, salary and benefits at the time of termination, any potential increase in salary through regular promotions and cost of living adjustment, the reasonable availability of other work opportunities, the period within which the plaintiff may become re-employed with reasonable efforts, and methods to discount any award to net present value.
>
> In formulating a front-pay award the district court may consider all evidence presented at trial concerning the individualized circumstances of both the employee and employer, but it must avoid granting the plaintiff a windfall.

Whittington, 429 F.3d at 1000-01 (citations, quotations omitted).  The district court, however, did not consider these factors in denying McInnis front pay and instead simply noted that McInnis "got a job where she's comfortable and doing well and seems to me that that would be much better for her than reinstatement." This was an error of law and, consequently, an abuse of discretion.

---

[15]  Fairfield argues that front pay is not available because McInnis never requested reinstatement.  However, "[a] plaintiff need not 'request reinstatement as a prerequisite to obtaining front pay where the evidence reveals an atmosphere of hostility.'" Prudential, 763 F.2d at 1173 n.2 (quoting Fitzgerald, 624 F.2d at 957).

McInnis's vocational expert testified that McInnis has absolutely no prospects of attaining a pay level equivalent to the pay she received at Fairfield.[16] Fairfield is the largest resort in the Pagosa Springs area, and the job market in the area is very limited. As a result, the record indicates that McInnis will be adversely affected by the termination of her employment with Fairfield. We therefore reverse the district court's denial of front pay and remand for the district court to determine in the first instance the proper award.

## C. Attorneys' Fees

With regard to the attorneys' fees award, McInnis argues on cross-appeal that the district court abused its discretion by 1) denying her discovery of Fairfield's attorneys' fees and costs; 2) denying her the opportunity to reply in support of her motion for attorneys' fees; and 3) reducing her requested attorneys' fee award by half.

### 1. Denial of discovery concerning Fairfield's billing records

Before the district court, McInnis sought to discover Fairfield's billing records, including attorneys' billing rates, costs, and hours expended, as relevant

---

[16] In November 2001, McInnis obtained a part-time consulting position with Angel Fire Resorts in New Mexico, earning $9.75 per hour. Angel Fire Resorts expanded this job to create a salaried position for $28,000 per year. However, this employment was not comparable to her employment at Fairfield because it paid less and required her to, at least periodically, commute to Angel Fire, which was located 3.5 hours from Pagosa Springs.

to the reasonableness of her own counsels' fees because, as she contends, it demonstrates Fairfield's maneuvering and provides comparative information about reasonable rates, fees, and hours expended in this case. While we have long "accepted the proposition that one of the factors useful in evaluating the reasonableness of the number of attorney hours in a fee request is the responses necessitated by the maneuvering of the other side," Robinson v. City of Edmond, 160 F.3d 1275, 1284 (10th Cir. 1998) (quotations omitted), McInnis's motion for attorneys' fees details the degree to which Fairfield's alleged maneuvering affected her attorneys' fees. Thus, although McInnis contends that evidence of Fairfield's attorneys' fees and expenses are relevant to the reasonableness of her counsels' fees, there is no evidence that the district court was not intimately aware of Fairfield's maneuvering and the tenacity with which Fairfield litigated this case. See City of Riverside v. Rivera, 477 U.S. 561, 580 n.11 (1986) ("The government cannot litigate tenaciously and then be heard to complain about the time necessarily spent by the plaintiff in response.") (quotations omitted).

Furthermore, McInnis has not justified discovery of Fairfield's attorneys' billing records beyond her allegations of maneuvering. We therefore cannot say that the district court abused its discretion by denying McInnis's motion to compel discovery of this evidence. In any event, for the reasons described below, McInnis will have an opportunity on remand to reply to Fairfield's challenge to

- 31 -

the reasonableness of her attorneys' hourly rates and time expended in this case with, for example, an expert report supporting her attorneys' fee petition and/or affidavits from local attorneys reflecting their customary fee for work in similar cases.

## 2. Denial of the opportunity to reply

McInnis argues that the district court abused its discretion by denying her the opportunity to reply in support of her motion for attorneys' fees. The district court's local rules provide that "[t]he moving party may file a reply within 15 days after the filing date of the response, or such lesser or greater time as the court may allow." D.C. Colo. L. Civ. R. 7.1(C). We review a district court's application of its local rules for abuse of discretion. See Hernandez v. George, 793 F.2d 264, 268 (10th Cir. 1986).

Our review of the district court docket indicates the following sequence of events: McInnis filed her motion for attorneys' fees and expert witness fees on July 23, 2004. Fairfield's response was filed on August 5. Under the local rules, then, McInnis had until August 20 to file a reply. See D.C. Colo. L. Civ. R. 7.1(C). On August 10, McInnis filed a motion for extension of time to file a reply. On August 12, the district court denied McInnis's motion for an extension in an order that stated, without further explanation: "FURTHER ORDERED that Plaintiff's request to reply regarding her Motion for Attorneys' Fees and Expert

Witness Fees is denied." Then, on August 19, a day before her reply was due under the general local rule time period, the court entered its award of attorneys' fees.

Without any explanation for its order, denying McInnis the opportunity to reply even though she was expressly authorized to do so under the district court's local rules was "an arbitrary, capricious, whimsical, or manifestly unreasonable judgment." Schrier v. Univ. of Colo., 427 F.3d 1253, 1258 (10th Cir. 2005). Accordingly, we conclude that the district court abused its discretion, and we remand with instructions to allow McInnis the opportunity to reply.

### 3. Reduction of requested attorneys' fee award

Because we are remanding to allow McInnis the opportunity to reply, we do not address whether the district court abused its discretion by decreasing McInnis's attorneys' fees award. However, we note that we see nothing intrinsically wrong with the district court's current award of attorneys' fees. While the district court must articulate reasons for its fee award, Public Serv. Co. v. Cont'l Cas. Co., 26 F.3d 1508, 1520 (10th Cir. 1994), "[a] general reduction of hours claimed in order to achieve what the court determines to be a reasonable number is not an erroneous method, so long as there is sufficient reason for its

use," Mares v. Credit Bureau of Raton, 801 F.2d 1197, 1203 (10th Cir. 1986).

Here, the district court found both the number of hours expended on this litigation and the hourly rate charged by McInnis's attorneys to be unreasonable, and it therefore reduced both. Additionally, we note that ultimately "an appellate court plays [only] a 'limited role' in reviewing a district court's award of attorneys' fees and costs, and deference is given to a district court's judgment on the matter, since the court is in a better position to assess the course of litigation and quality of work." Gamble, Simmons & Co. v. Kerr-McGee Corp., 175 F.3d 762, 773-74 (10th Cir. 1999). However, once the district court considers McInnis's reply brief, it will be in a better position to consider anew the matter of the award of attorneys' fees.

## CONCLUSION

For the foregoing reasons, we AFFIRM the district court's decision on all appeal issues, REVERSE on all cross-appeal issues, and REMAND for further proceedings consistent with this opinion.