**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**FEB 10 2004**

**PATRICK FISHER**
**Clerk**

PUBLISH

# UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

ELADIO RODRIGUEZ, individually;
MARTIN GOMEZ, individually,

    Plaintiffs - Appellants,

vs.

WHITING FARMS, INC.; THOMAS
WHITING, individually,

    Defendants - Appellees.

No. 02-1483

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. No. 99-RB-2490 (CBS))**

---

Patricia L. Medige, Colorado Legal Services, Denver, Colorado, for Plaintiffs -
Appellants.

Sam D. Starritt (and Michael C. Santo, on the brief), Dufford, Waldeck, Milburn
& Krohn, L.L.P., Grand Junction, Colorado, for Defendants - Appellees.

---

Before **KELLY**, **HARTZ**, Circuit Judges and **CASSELL**[*], District Judge.

---

**KELLY**, Circuit Judge.

---

[*]The Honorable Paul G. Cassell, United States District Judge for the
District of Utah, sitting by designation.

Plaintiffs-Appellants Eladio Rodriguez and Martin Gomez brought this suit against their former employer, Thomas Whiting and Whiting Farms, Inc. (hereinafter collectively referred to as "Whiting Farms"), claiming Whiting Farms failed to pay them overtime as required under the Fair Labor Standards Act (the "FLSA" or the "Act"). Whiting Farms argues it is exempt from paying Rodriguez and Gomez overtime under the FLSA agricultural exemption, which provides an exemption to the overtime wage requirements for "any employee employed in agriculture." 29 U.S.C. § 213(b)(12). Rodriguez and Gomez filed a motion for summary judgment on the issue of whether they performed nonagricultural jobs and thus were entitled to overtime pay under the FLSA. Whiting Farms also moved for summary judgment on all issues. The district court determined Rodriguez and Gomez were engaged in agricultural work and therefore were not entitled to overtime under the agricultural exemption. The district court granted Whiting Farms's motion for summary judgment and awarded costs to Whiting Farms. We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

Background

The facts in this case are not disputed. Thomas Whiting is the president and owner of Whiting Farms, Inc. Whiting Farms breeds and raises chickens for their feathers, which are removed in pelts, packaged, and sold to a distributor for

eventual use in fly-tying. All of the poultry production takes place on four ranches owned or leased by Whiting Farms, Aplt. Br. at 7, and Whiting Farms only processes chickens raised on its own farms, Aplee. Br. at 3. In 2000, Whiting Farms processed 120,000-125,000 chickens. Id. at 4.

Whiting Farms breeds the chickens, pedigrees the eggs, hatches them, broods the chickens, and raises them for approximately one year, after which the chickens are processed for their feathers. Aplt. Br. at 6. Once the chickens have reached approximately fifty weeks old, they are euthanized, left to cool overnight, and processed. Skinners first cut off the necks and heads of the chickens, which are then washed and dried. Fifteen to twenty percent of the pelts are dyed at this stage, before the necks are skinned. After washing and spinning, the necks are skinned by removing the skin and attached feathers (known as a "cape"). The capes are placed on cardboard sheets and placed in a room that is between seventy-five and eighty degrees to cure for two weeks. Id. at 9-10.

While the heads and necks are washed and dried, the skinners skin the back of the bird, known as the "saddle." The saddles are also placed on cardboard by "putter-uppers." The saddles are cured for one to two weeks in a heated room prior to washing, and overall they are cured between three and four months. The saddles are cured in a hotter room for a longer period due to the higher overall fat content. Id. at 10-11.

After curing, the saddles are trimmed by "trimmers" to remove peripheral skin. The capes are also trimmed into a rounder shape and excess feathers are removed. Both capes and saddles are graded and either packaged individually or placed in bulk storage. Aplt. Br. at 11. The pelts, also called "hackle," have an almost indefinite shelf life when stored properly. Whiting Farms produces hackle year round, with some decrease in production during the late summer and early fall. Id.

Rodriguez and Gomez worked for Whiting Farms as skinners and trimmers. They regularly worked more than forty hours per week and were not paid time-and-one-half, or overtime, for those hours over forty worked in a single workweek. Rodriguez and Gomez brought this suit against Thomas Whiting and Whiting Farms, Inc. seeking payment of past overtime wages.

After granting summary judgment for Whiting Farms, the court awarded Whiting Farms costs under Fed. R. Civ. P. 54(d)(1). Aplt. Br., Ex. A at 19. The court clerk taxed costs of $3,128.18 against Rodriguez and Gomez and entered judgment for that amount. They filed a motion seeking retaxation of costs, citing "their indigence and the close and difficult nature of the questions presented by this case as bases for their request." Id., Ex. C at 1. The court denied the motion but stayed the collection of costs pending appeal. Id. at 3.

Rodriguez and Gomez assert the district court erred in (1) holding Whiting

Farms exempt under the agricultural exemption to the FLSA and (2) awarding

costs to Whiting Farms.


## Discussion

### A.  Application of the Agricultural Exemption

Summary judgment is appropriate when there are no genuine issues of

material fact and the moving party is entitled to judgment as a matter of law.  Fed.

R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  We review a

grant of summary judgment de novo, applying the same legal standards applied by

the district court.  Byers v. City of Albuquerque, 150 F.3d 1271, 1274 (10th Cir.

1998).  In addition, exemptions under the FLSA "are to be narrowly construed

against the employers seeking to assert them and their application limited to those

establishments plainly and unmistakably within their terms and spirit."  Arnold v.

Ben Kanowsky, Inc., 361 U.S. 388, 392 (1960); see also Sanders v. Elephant

Butte Irrigation Dist., 112 F.3d 468, 471 (10th Cir. 1997).  Thus Whiting Farms

bears the burden of showing its processing activities fit "plainly and

unmistakably" within the terms and spirit of the agricultural exemption.

### 1.  The Fair Labor Standards Act and the Agricultural Exemption

The Fair Labor Standards Act establishes various labor requirements, such

as a minimum wage and overtime pay, for employees "in those workweeks when

they are engaged in interstate or foreign commerce or in the production of goods for such commerce." 29 C.F.R. § 780.1. One of the Act's requirements is the payment to employees of "one and one-half times the regular rate" for hours worked in excess of forty in a single workweek. 29 U.S.C. § 207(a)(1); see also id. § 215(a)(2) (making it unlawful for any person to violate the provisions of § 207). Employers must satisfy the Act's requirements unless the Act provides an applicable exemption. One such exemption exists for "any employee employed in agriculture." Id. § 213(b)(12). Agriculture is defined at 29 U.S.C. § 203(f) (emphasis added):

> "Agriculture" includes farming in all its branches and among other things includes the cultivation and tillage of the soil, dairying, the production, cultivation, growing, and harvesting of any agricultural or horticultural commodities . . . , the raising of livestock, bees, fur-bearing animals, or poultry, and any practices (including any forestry or lumbering operations) performed by a farmer or on a farm as an incident to or in conjunction with such farming operations, including preparation for market, delivery to storage or to market or to carriers for transportation to market.

This definition of agriculture contains two distinct branches, and "includes farming in both a primary and a secondary sense." Bayside Enters., Inc. v. NLRB, 429 U.S. 298, 300 (1977); see Farmers Reservoir & Irrigation Co. v. McComb, 337 U.S. 755, 762-63 (1949); NLRB v. Karl's Farm Dairy, Inc., 570 F.2d 903, 905 (10th Cir. 1978); 29 C.F.R. § 780.105. The first contains the primary meaning of agriculture, which includes "farming in all its branches" and

includes "the raising of . . . poultry." 29 U.S.C. § 203(f). The definition also includes a second, broader meaning of agriculture. This secondary meaning includes other practices that do not themselves fit within the primary meaning of agriculture, but that are nevertheless "performed by a farmer or on a farm as an incident to or in conjunction with such farming operations." Id. The agricultural exemption was meant to apply broadly and to "embrace the whole field of agriculture," but "it was meant to apply only to agriculture;" thus the critical issue is what is and what is not included within that term. Maneja v. Waialua Agric. Co., 349 U.S. 254, 260 (1955).

2. Application of Exemption to Whiting Farms

Rodriguez and Gomez do not dispute that the handling of live chickens on Whiting Farms constitutes agricultural work under the primary definition of agriculture. Aplt. Br. at 5. By definition, the statute includes the raising of poultry, 29 U.S.C. § 203(f), which includes the "breeding, hatching, propagating, feeding, and general care of poultry." 29 C.F.R. § 780.125(b); see also Holly Farms Corp. v. NLRB, 517 U.S. 392, 399 (1996) ("Primary farming includes the raising of poultry."). Rodriguez and Gomez argue, however, that the processing of hackle following slaughter is not included under the definition of agriculture, and thus the agricultural exemption is inapplicable. It is true "[s]laughtering, which is the antithesis of 'raising,' is not included" in the primary definition of

agriculture.  § 780.125(b).  Slaughtering nevertheless will constitute agriculture if it comes "within the secondary meaning of the term 'agriculture.'"  Id.  Thus Whiting Farms argues the skinning and trimming of chickens on its farm fits within the secondary definition of agriculture.

To constitute secondary farming, the practice must be (1) "performed by a farmer or on a farm," and (2) the practice must be "incident to or in conjunction with such farming operations."  29 U.S.C. § 203(f).  Preparation for market is included in secondary farming.  Id.; see 29 C.F.R. §§ 780.150-.151.  The chicken processing at issue occurs on Whiting Farms and neither party disputes that the practice is performed "on a farm."  Thus we must address the central issue of whether the skinning and trimming of chickens in this case is "incident to or in conjunction with such farming operations."  29 U.S.C. § 203(f).

As the Supreme Court has recognized, "'[t]he line between practices that are and those that are not performed 'as an incident to or in conjunction with' such farming operations is not susceptible of precise definition.'"  Holly Farms, 517 U.S. at 408 (quoting 29 C.F.R. §780.144); see also 29 C.F.R. § 780.145 ("The character of a practice as part of the agricultural activity or as a distinct business activity must be determined by examination and evaluation of all the relevant facts and circumstances in the light of the pertinent language and intent of the Act.").  The regulations and case law have eschewed a "mechanical application of

isolated factors or tests" and instead look at the overall circumstances. 29 C.F.R. § 780.145; see Maneja, 349 U.S. at 265-69. Nevertheless, the regulations set out various factors to consider when determining whether a practice is performed as an incident to or in conjunction with the farming operations. See 29 C.F.R. § 780.145.

In addition to considering the common understanding of farming, competitive factors, and the prevalence of the practice by farmers, courts may also consider: (1) the "size of the operations and respective sums invested in land, buildings and equipment for the regular farming operations and in plant and equipment for performance of the practice;" (2) "the amount of the payroll for each type of work;" (3) "the number of employees and the amount of time they spend in each of the activities;" (4) "the extent to which the practice is performed by ordinary farm employees and the amount of interchange of employees between the operations;" (5) "the amount of revenue derived from each activity;" (6) "the degree of industrialization involved;" and (7) "the degree of separation established between the activities." Id.; see also Maneja, 349 U.S. at 264-65 (considering similar factors). The district court considered these factors and concluded that this is a "borderline case" in which the factors do not "provide a conclusive resolution of the question." Aplt. Br., Ex. A at 14. Upon a thorough review of the facts in this case, we agree.

Whiting Farms's investment in facilities for live production is far greater than its processing and packaging facilities, which make up only 11.8% of its total investment. Aplt. Br., Ex. A at 13. Processing labor costs totaled approximately 18% in 1997 and 1998. Aplt. Br. at 12. Approximately the same number of labor hours were spent in both processing and live poultry in the same period. Id. at 13. Approximately one-third of the workers at Whiting Farms are employed in processing, id., and they are paid a somewhat higher wage, id. at 12. There is little interchange between those workers involved in the production of chickens and those involved in the processing of hackle on Whiting Farms. Id. at 15. Whiting Farms processes its own chickens and sells only the final processed pelts, and thus nearly all of Whiting Farms's revenue is derived from the sale of the final processed pelts.[1] Finally, the skinning and trimming of chickens, while it does require skill, is not done by factory workers in a highly industrialized setting, but by a small number of workers using common tools such as scissors, paring knives, and scalpels on the farm itself. Aplee. Br. at 7, 8.

These facts generally illustrate that more money and labor is invested in the live production of chickens, and that the processing is a smaller but significant part of Whiting Farms's operation. There is a separation between the various

---

[1]This does not lead to the conclusion, however, that the processing alone gives value to the pelts, as Rodriguez and Gomez argue. Aplt. Br. at 35. The feathers are in substantially the same condition prior to removal.

activities, but the skinning and trimming of the pelts is not highly industrialized and is subordinate to the farming activities themselves. Thus, as in Maneja, we must "add to the factors above some consideration of what is ordinarily done by farmers with regard to this type of operation." 349 U.S. at 265; see also Mitchell v. Budd, 350 U.S. 473, 475 (1956).

The regulations state that, generally, "a practice performed in connection with farming operations is within the statutory language only if it constitutes an established part of agriculture, is subordinate to the farming operations involved, and does not amount to an independent business." 29 C.F.R. § 780.144. Whether a "practice is ordinarily performed by farmers incidentally to their farming operations" has a "direct bearing on whether a practice is an 'established' part of agriculture." Id. § 780.146. Thus a comparison with "what is ordinarily done by farmers with regard to this type of operation" has a "direct bearing" on whether the practice of skinning and trimming is really incident to farming. Maneja, 349 U.S. at 265-66.

If a comparison is made between Whiting Farms and all other poultry producers, as Rodriguez and Gomez urge, Whiting Farms's pelt processing would be found unusual and outside of the exemption as in Maneja and Mitchell. Such a broad comparison, however, would discourage unique farming practices. The Supreme Court has specifically recognized that the exemption "includes

- 11 -

'extraordinary methods' of agriculture as well as the more conventional ones." Mitchell, 350 U.S. at 480-81. The evidence suggests raising chickens for their feathers is a different farming operation than raising chickens for their meat, and therefore it is logical to limit the comparison to farmers who also raise chickens for their pelts to determine what is the ordinary and established practice. See Wirtz v. Tyson's Poultry, Inc., 355 F.2d 255, 258 (8th Cir. 1966) (considering what is ordinary for "egg processing" rather than considering the whole poultry industry).

The record in this case indicates there are only a handful of hackle farmers in the United States who raise chickens for the sole purpose of producing quality pelts. Aplee. Br. at 39. As the district court noted, Aplt. Br., Ex. A at 15, it is uncontroverted that those producers raise their own chickens and process the hackle on the farm using methods similar to those used by Whiting Farms. Aplee. Br. at 39. Whiting Farms's practices thus fit within "what is ordinarily done by farmers with regard to this type of operation." Maneja, 349 U.S. at 265. Thus it appears the skinning and trimming of chicken pelts is an established part of agriculture and subordinate to other chicken raising practices.

In addition to ordinary practices, courts have placed great weight on the type of product that results from the practice. A change to the "raw or natural state of the commodity . . . may be a strong indication that the practice is not

- 12 -

within the scope of agriculture," 29 C.F.R. § 780.147; <u>Mitchell</u>, 350 U.S. at 481-82, but is "more akin to manufacturing." 29 C.F.R. § 780.129; <u>Maneja</u>, 349 U.S. at 265 (finding processing of sugar cane into sugar more akin to manufacturing). Manufacturing and industrial operations are not included in secondary farming. 29 C.F.R. § 780.129. During Senate debates regarding the Act, one strong supporter considered the change in the product as "marking the dividing line" between agricultural function and manufacturing. <u>Maneja</u>, 349 U.S. at 268.

Some change from the raw or natural state in preparation for market must be included in secondary farming based on the examples in the regulations. Preparation of fruits and vegetables includes "[a]ssembling, ripening, cleaning, grading, sorting, drying, preserving, packing, and storing." 29 C.F.R. § 780.151(b). Preparation of tobacco for market includes "[h]andling, grading, drying, stripping from stalk, tying, sorting, storing, and loading." <u>Id.</u> § 780.151(i). However, in <u>Mitchell</u>, the Supreme Court held the tobacco bulking process "substantially changes the physical properties and chemical content of the tobacco," and thus found this aspect of the tobacco growing enterprise outside the scope of the agricultural exemption. 350 U.S. at 475. In <u>Maneja</u>, the Supreme Court held the processing of sugar cane changed the sugar cane from its raw or natural state, making it outside the agricultural exemption. 349 U.S. at 268. Thus we must look at the degree of change to determine if the skinning and trimming of

pelts constitutes manufacturing.

In this case, there is some change from the raw or natural state. Although the pelts are changed in the process of skinning and trimming, and although a small percentage are dyed, the changes to the product are not substantial and the pelt itself is preserved in much the same state as it was prior to processing. The analogy to preparation of fur for market, which is considered agricultural under the regulations, is particularly persuasive. Preparation of fur for market includes "[r]emoving the pelt, scraping, drying, putting on boards, and packing." 29 C.F.R. § 780.151(m). Similarly, Whiting Farms removes, washes, dries, trims, and packages the pelts. This type of processing appears to fall directly in line with the preparation for market considered incidental to farming under the regulations.

Rodriguez and Gomez argue that an analogy to the removal and treatment of pelts from fur-bearing animals is inappropriate because there are specific poultry regulations that are determinative. See 29 C.F.R. § 780.125. Because the poultry regulations do not reference the processing of chickens for their pelts, Rodriguez and Gomez argue such processing is not included. We decline to read the regulations as the limit of covered activities under the exemption. The fur regulations provide insight into the type of preparation for market that is considered incidental to farming, and we find it persuasive. The regulations

themselves recognize that the exemptions, "because of their relationship to one another, should be construed together insofar as possible so that they form a consistent whole." 29 C.F.R. § 780.9. Because the amount of change is similar to that which is acceptable under the regulations, it appears the skinning and trimming of pelts is more akin to agriculture than manufacturing.

Despite the above analysis, Rodriguez and Gomez argue we should defer in our analysis to an opinion letter from the Department of Labor in which Michael Ginley, Director of Enforcement Policy at the U.S. Department of Labor, concluded Whiting Farms's processing activities were not agricultural and therefore outside the scope of the exemption. Aplt. Br. at 51-52. The letter was written in response to an inquiry by Rodriguez and Gomez based on the facts as they laid them out. Whiting Farms has also produced a Department of Labor report in which a local wage/hour investigator conducted an investigation of Whiting Farms, including a visit to the farm, and concluded the operations were covered under the exemption. Aplee. Br. at 52. Whiting Farms also offers forth a phone conversation with the Department of Labor in which an investigator similarly concluded Whiting Farms was exempt. Thus we have conflicting opinions that are each arguably more or less persuasive than the other.

It is true under <u>Skidmore v. Swift & Co.</u>, 323 U.S. 134, 140 (1944), that we may look to such opinions for guidance. Such interpretations are "'entitled to

respect.'" Christensen v. Harris County, 529 U.S. 576, 587 (2000) (quoting Skidmore, 323 U.S. at 140). However, "[t]he weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." Skidmore, 323 U.S. at 140; see also United States v. 162 MegaMania Gambling Devices, 231 F.3d 713, 719 (10th Cir. 2000); Brennan v. S. Davis Cmty. Hosp., 538 F.2d 859, 863 & n.4 (10th Cir. 1976). We agree with the district court that neither letter presents an analysis that is "particularly persuasive." Aplt. Br., Ex. A at 12. Given our analysis, the Ginley letter does not tip the scale in favor of finding the exemption inapplicable.

Rodriguez and Gomez advance several additional arguments to support their appeal, all of which do not change the strong support for application of the exemption above. The various NLRB cases presented do not support a different conclusion. See, e.g., NLRB v. C&D Foods, 626 F.2d 578 (7th Cir. 1980) (discussing the processing, by 200 employees in a dressing plant, of ducks raised by local contractors). Rodriguez and Gomez also argue a review of the legislative history illustrates that the policy reasons behind the exemption–to allow for fluctuations in seasonal work and increased work due to perishable commodities–do not apply here. The regulations do not limit the exemption to

those practices that fluctuate seasonally, however, and this should not be determinative. Finally, although it is an arguably "close case," and the exemption should be construed narrowly, the weight of the analysis supports the conclusion that Whiting Farms's processing operations fit within the exemption. The agricultural exemption was meant to apply broadly and "embrace the whole field of agriculture." Maneja, 349 U.S. at 260. If a practice is found to fit within the definition of agriculture, the agricultural exemption should apply.

Whiting Farms breeds chickens and raises them for approximately a year prior to processing. Whiting Farms only processes those chickens it has raised. The pelts are removed and dried so they may be shipped or stored. As with the other commodities included in the regulations, such as fur, dried fruit, and honey, Whiting Farms is merely isolating the product it has produced and preparing it for market. Compare NLRB v. Karl's Farm Dairy, Inc., 570 F.2d 903, 906 (10th Cir. 1978) (processing of milk by dairy farmer included because in order to be sold the milk must be processed), with NLRB v. Tepper, 297 F.2d 280, 281-82 (10th Cir. 1961) (processing of milk by an employer who was primarily a processor and processed milk from other farms not included under exemption). After considering the various factors laid out by the regulations and case law, we conclude the skinning and trimming of chickens is a "subordinate and necessary task incident to [Whiting Farms's] agricultural operations." Maneja, 349 U.S. at

263.  The skinning and trimming of pelts on Whiting Farms fits within the definition of secondary agriculture, and therefore Whiting Farms is exempt under the FLSA's agricultural exemption from paying Rodriguez and Gomez overtime.

B.  Award of Costs under Federal Rule of Civil Procedure 54(d)

Federal Rule of Civil Procedure 54(d) provides that "[e]xcept when express provision therefor is made either in a statute of the United States or in these rules, costs other than attorneys' fees shall be allowed as of course to the prevailing party unless the court otherwise directs."  Rodriguez and Gomez appeal the imposition of costs in favor of Whiting Farms, arguing that their indigent status and the close and difficult question presented by this case justify a waiver of costs.  We review the district court's grant of costs under Rule 54(d) for an abuse of discretion.  AeroTech, Inc. v. Estes, 110 F.3d 1523, 1526 (10th Cir. 1997).

Whether or not a prevailing party shall be awarded costs is "within the court's sound discretion."  Homestake Mining Co. v. Mid-Continent Exploration Co., 282 F.2d 787, 804 (10th Cir. 1960).  Nevertheless, Rule 54 creates a presumption that the district court will award the prevailing party costs.  Cantrell v. Int'l Bhd. of Elec. Workers, 69 F.3d 456, 458-59 (10th Cir. 1995).  Thus the established rule is that costs are generally awarded to the prevailing party.  Zeran v. Diamond Broad., Inc., 203 F.3d 714, 722 (10th Cir. 2000); AeroTech, 110 F.3d at 1527; Klein v. Grynberg, 44 F.3d 1497, 1506-07 (10th Cir. 1995); Serna v.

<u>Manzano</u>, 616 F.2d 1165, 1167-68 (10th Cir. 1980). The burden is on the non-prevailing party to overcome this presumption. <u>Cantrell</u>, 69 F.3d at 459. When a district court exercises its discretion and denies costs to a prevailing party, it must provide a valid reason for the denial. <u>Id.</u>

The district court concluded that the plaintiffs were indigent, and that the case did present a "close and difficult question." Aplt. Br., Ex. C at 2-3. The court nevertheless concluded there was no reason "defendants should be penalized by reducing the award of costs." <u>Id.</u> at 3. Other circuits have recognized that the indigent status of the non-prevailing party and the presentation of issues that are close and difficult are both "circumstances in which a district court may properly exercise its discretion under Rule 54(d) to deny costs to a prevailing party." <u>Cantrell</u>, 69 F.3d at 459; <u>see also</u> <u>AeroTech</u>, 110 F.3d at 1526. However, as the district court noted, the denial of costs is "in the nature of a severe penalty," and "there must be some apparent reason to penalize the prevailing party if costs are to be denied." <u>Klein</u>, 44 F.3d at 1507; <u>see also</u> <u>AeroTech</u>, 110 F.3d at 1526-27. The burden is on Rodriguez and Gomez, and they have not offered any reason why Whiting Farms should be penalized in this case. It was not an abuse of the court's discretion to award costs to Whiting Farms as the prevailing party.

AFFIRMED.