**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**UNITED STATES COURT OF APPEALS**

**May 12, 2008**

**FOR THE TENTH CIRCUIT**

**Elisabeth A. Shumaker**
**Clerk of Court**

KENT W. FOWLER; CODY
FOWLER; LARRY BURRIS;
MICHAEL LEACH; FRANCES
WOODS; ROSEOLA THORNBURG;
KATHERINE CARROLL; BETTIE
BURNETT; LISA SMITH; ALICE
SMITH; LESA HORNEY;
CHRISTINE LANE-HUCKABY;
KENYA WASHINGTON; YOLANDA
WHITE; ANGELA MCVAY;
WAKEETHA ATKESON; ANGIE
MILLER; RUBY MCGEE; CARMEN
KIRKLAND; ANNTONETT
TAYLOR; DELORIS WILSON; TIA
SALLIS; SHERRY SALLIS; BRUCE
MCCARTHY; NICOLE PIERCE;
CYNTHIA WHITEFIELD; JORETTA
TRUITT; JUDY BLACKMER;
LAJOYA DAVIS; LECEIF SPRING;
MISTY GRAHAM; SONYA JULY;
STEPHANIE NEWMAN, individually
and standing in the stead of other
persons similarly situated,

          Plaintiffs-Appellants,

  v.

INCOR; SHELTERED WORK
ACTIVITY PROGRAM, INC., an
Oklahoma Corporation d/b/a INCOR;
EDWARD BREEN; BETSY BREEN,

          Defendants-Appellees.

No. 05-7113
(D.C. No. 6:03-CV-00321-RAW)
(E.D. Okla.)

## ORDER AND JUDGMENT[*]

Before **HENRY**, Chief Judge, **ANDERSON** and **McCONNELL**, Circuit Judges.

Appellee Incor is in the business of providing services to developmentally disabled adults in northeastern Oklahoma, including operation of a residential program. Its residential-program employees work as habilitation training specialists and/or house managers, responsible for round-the-clock care of Incor's clients, most of whom have physical disabilities and function at mental levels ranging from a one-year to six-year-old. The employees sued for unpaid wages under the Fair Labor Standards Act, 29 U.S.C. §§ 201-219 (FLSA). Prior to trial, the district court entered summary judgment for Incor that denied liquidated damages and applied a two-year statute of limitations. Following a bench trial, the court made findings of fact and conclusions of law, and entered judgment in favor of Incor and against the employees on all of their claims.[2] We affirm the

[*]      After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

[2]      The trial court ruled that Edward Breen and Betsy Breen, the owners of Incor, are employers under 29 U.S.C. § 203(d) and thus jointly and severally

(continued...)

-2-

court's summary judgment order applying a two-year statute of limitations to the employees' claims. However, we vacate the court's findings of fact and conclusions of law, reverse its order on summary judgment denying liquidated damages, and remand the case for further proceedings consistent with this order and judgment.

## I. PRIVATE HOMES

### A. The Statutory And Regulatory Framework

The employees' first claim was for overtime wages on the theory that they were not providing companionship services in private homes. The FLSA requires payment of overtime compensation for certain employees who work more than forty hours per week. 29 U.S.C. § 207. At the same time, 29 U.S.C. § 213(a)(15) provides an exemption for overtime to, inter alia, "any employee employed in domestic service employment to provide companionship services for individuals who (because of age or infirmity) are unable to care for themselves[.]" A related Department of Labor (DOL) regulation provides that "domestic service employment" means "services of a household nature performed by an employee in

[2](...continued)
liable for any judgment. The Breens do not cross-appeal from the ruling and are bound by it.

-3-

or about a private home . . . of the person by whom he or she is employed."

29 C.F.R. § 552.3.[3]

### B.  The Burden Of Proof

The Supreme Court has held that FLSA "exemptions are to be narrowly construed against the employers seeking to assert them and their application limited to those establishments plainly and unmistakably within their terms and spirit." *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960).  Further, "the general rule [is] that the application of an exemption under the [FLSA] is a matter of affirmative defense on which the employer has the burden of proof." *Corning Glass Works v. Brennan*, 417 U.S. 188, 196-97 (1974); *see also Sanders v. Elephant Butte Irrigation Dist. of N.M.*, 112 F.3d 468, 470 (10th Cir. 1997).  In light of these principles, we have held that an employer must prove an exemption by "clear and affirmative evidence." *Aaron v. City of Wichita*, 54 F.3d 652, 657 (10th Cir. 1995).

Our use of "clear and affirmative evidence," *id*., has lead to confusion whether this in fact means clear and convincing evidence – a burden beyond the

---

[3]      In *Long Island Care at Home, Ltd. v. Coke*, 127 S. Ct. 2339 (2007), the Supreme Court upheld the validity of § 552.109(a), which extends the application of the companionship services exemption to workers employed by a third party such as Incor.  *See also Welding v. Bios Corp.*, 353 F.3d 1214, 1217 n.3 (10th Cir. 2004) ("The exemption can apply even when the domestic service employee is actually employed by a service agency[.]"); *Johnston v. Volunteers of Am., Inc.*, 213 F.3d 559, 562 (10th Cir. 2000) (same).  In the interest of judicial economy, we delayed our review of this case pending the decision in *Long Island Care*.

preponderance of evidence standard traditionally applied in civil cases. This is not the case; instead, clear and affirmative evidence is simply an "invocation of the familiar principle of statutory interpretation that exemptions from a statute that creates remedies that should be construed narrowly," *Yi v. Sterling Collision Centers, Inc.*, 480 F.3d 505, 508 (7th Cir. 2007), and "also that the burden of proof is on the [employer], since entitlement to an exemption is an affirmative defense." *Id*. at 507. "[A] silent or ambiguous record" is not affirmative evidence. *United States v. Bush*, 405 F.3d 909, 921 (10th Cir. 2005).

## C. The Standard Of Review

In determining whether an exemption to the FLSA applies, we review the trial court's factual determinations for clear error and its legal conclusions de novo. *Sanders*, 112 F.3d at 470. Specifically, the key factors described in *Welding v. Bios Corp.*, 353 F.3d 1214 (10th Cir. 2004), used to determine whether a residence is a private home, are questions of fact reviewed under a clearly erroneous standard. *Sanders*, 112 F.3d at 470. However, the question of whether a particular living unit is a private home and therefore excluded from overtime, is a question of law reviewed de novo. *Id.* Further, "[w]hether the district court failed to consider or accord proper weight or significance to relevant evidence are questions of law [this court] review[s] de novo." *Flying J Inc. v. Comdata Network, Inc.*, 405 F.3d 821, 829 (10th Cir. 2005) (quotation marks and citations omitted).

Despite our disapproval of the practice,[4] the trial court essentially adopted verbatim the proposed findings of fact and conclusions of law submitted by Incor. *Compare* "Defendant's Findings of Fact and Conclusions of Law," Aplt. App., Vol. X at 5414-86, *with* "Findings of Fact and Conclusions of Law," *id*. at 5487-5584. But we need not decide whether the findings of fact are clearly erroneous, because the findings and conclusions misstate the law and fail to consider or give proper weight to relevant evidence, which are legal questions we review de novo. On remand, we direct the court to make its own findings of fact based on its review of the evidence and to apply the law set forth in this order and judgment.

## D. Analysis

In determining whether companionship services are provided in a private home, "the object of evaluation is the living unit of the person receiving the services, i.e., the client. The client's living unit consists of the client's bedroom

---

[4]     We disapprove of the practice for many reasons, including that "[t]he court's wholesale adoption of one party's proposed findings of fact and conclusions of law provides little aid on appellate review, particularly in the likely event that the adopted submission takes an adversarial stance." *Flying J Inc. v. Comdata Network, Inc*., 405 F.3d 821, 830 (10th Cir. 2005) (citation omitted).

and the common areas to which the client has access.[5]  The court must evaluate each living unit separately[.]"  *Welding,* 353 F.3d at 1218.

The key inquiries to determine whether the living unit is a private home are "who has ultimate management control of the living unit and whether the living unit is maintained primarily to facilitate the provision of assistive services." *Id.* at 1219.  There are several factors used to answer these key inquiries, including:  (1) did the client live in the living unit as his or her private home before receiving services; (2) who owns the living unit; (3) who manages and maintains the residence; (4) would the client be allowed to live in the living unit if he or she was not receiving services; (5) the relative difference in the cost/value of the services provided and the total cost of maintaining the living unit; and (6) whether the service provider uses any part of the living unit for its own business purposes.  *Id.* at 1219-20.

"The first factor is whether the client lived in the living unit as his or her private home before beginning to receive the services."  *Id.*  As *Welding* teaches, having lived in the living unit as a private home prior to the onset of services is "a powerful indicator that the residence is a private home."  *Id.*  There is the "easy-to-spot private home . . . where the families lived in their homes prior to

---

5       In addition to a traditional single-family home, Department of Labor regulations provide that "[a] separate and distinct dwelling maintained by an individual or a family in an apartment house, condominium or hotel may constitute a private home."  29 C.F.R. § 552.101(a).

and independent of their receipt of companion services," *id.* (citation and quotation marks omitted), compared to non-private homes where the clients have never lived without the assistance of a service provider. In its proposed conclusions of law, Incor tried to explain away the lack of any evidence on this factor by representing that "[m]ore importantly . . . the uncontradicted evidence at trial was that Incor's clients were always allowed to freely move into different residences and with roommates, if they so choose." Aplt. App., Vol. X at 5573. Setting aside the fact that this sweeping conclusion lacks record support, it has nothing to do with whether the client lived in the living unit *as his or her private home* before beginning to receive services.

"The second factor is who owns the living unit. Ownership is significant because it evidences control." *Welding*, 353 F.3d at 1219. In situations where the living units are owned by a third party, "that is a more ambiguous indicator, and the court must look to see who leases the unit from the third party." *Id.* Contrary to Incor's finding that "no evidence was presented at trial that Incor had any possessory interest in, or right to, the client's homes," Aplt. App., Vol. X at 5574, Incor was listed as the tenant/lessee or responsible party on four leases (2200 Turner Street, 901 Erie, 200 East Monroe, and 505 North G Street), which "is some indication that it is not a private home." *Welding*, 353 F.3d at 1219. And although it is true that the clients signed or made their marks on the leases for the remaining living units, which "is some indication that [they are] private home[s],"

-8-

*id.*, that is not the end of the inquiry.  Instead, "residences []managed by [habilitation training specialists] . . . do not fit plainly and unmistakably into the ordinary connotation of the words 'private home' . . . notwithstanding the fact that the lease may bear the name of a developmentally disabled person." *Johnston v. Volunteers of Am., Inc.*, 213 F.3d 559, 565 (10th Cir. 2000).

"The third factor is who manages and maintains the residence.  In other words, who provides the essential things that the client needs to live there, such as paying the mortgage or rent, paying for gas, electricity, and water, providing clean linens and clothes, and providing food?"  *Welding*, 353 F.3d at 1219. "If many of the essentials of daily living are provided for by the client or the client's family, that weighs strongly in favor of it being a private home.  If they are provided for by the service provider, that weighs strongly in favor of it not being a private home."  *Id*. at 1220.  Incor's findings failed to consider "who provides the essential things that the client needs to live there[.]"  Instead, it offered that because the clients and/or their guardians participated in developing individual training plans and had service agreements with Incor, they had management control.  This distorts *Welding*, which states that the object of evaluation is the living unit – not ancillary agreements.

"The fourth factor is whether the client would be allowed to live in the unit if the client were not contracting with the provider for services."  *Id*. at 1220. As a matter of common sense, "[i]f the client would be allowed to live in the unit

-9-

without contracting for the services, that weighs in favor of it being a private home.  If the client would not be allowed to live in the unit without contracting for the provider's services, that weighs in favor of it not being a private home." *Id.*  Contrary to *Welding*, Incor re-framed the inquiry as the "[p]otential [c]ontinuity of [o]ne [c]lient in the [r]esidence," Aplt. App., Vol. X at 5575, and reasoned that because it was not the landlord, a client would be allowed to live in the unit even if he or she fired Incor.  This ignores the fact that there was no evidence that any landlord would have rented to any of these clients unless they had a service provider.  In the absence of such evidence, Incor could only speculate that "there is no reason to believe a client could not remain in their home in the event Incor's services were terminated." *Id.*  The error was compounded by relying on 42 U.S.C. § 3604(f)(1)(A) for the conclusion that a landlord could not terminate the lease and/or refuse to rent to disabled persons. The statute, however, applies only to properties owned, operated, or financed by the federal government. *See id.* § 3603(a)(1)(A)-(D).

"The fifth factor is the relative difference in the cost/value of the services provided and the total cost of maintaining the living unit (including government subsidies)." *Welding*, 353 F.3d at 1220.  As *Welding* explains, this factor "relate[s] to the purpose for which the living unit is primarily maintained." *Id.* "If the cost/value of the services is incidental to the other living expenses, that weighs in favor of it being a private home.  If the cost/value of the services is a

-10-

substantial portion of the total cost of maintaining the living unit, that weighs in favor of it not being a private home." *Id.* Incor tortured the fifth factor beyond recognition. Because its analysis is not easily summarized, we quote it in full:

> [T]he HTS services were paid in full by the DHS (i.e., the client paid nothing for the services). Conversely, the client was responsible to 'pay up to 90% of the income, not to exceed $14.00 per day' to cover the expenses of maintaining the living unit (i.e., rent, insurance, utilities, groceries, etc.). Thus, the cost of the HTS services to the client was not any portion of the total cost to the client for maintaining his or her home.

Aplt. App., Vol. X at 5575. An example of how the fifth *Welding* factor should be applied is Edward Breen testified for one client for one year at 505 Judy Lane, daily living expenses were $47,000, habilitation services were $60,736, and transportation costs were $3,700. The trial court should then compare the relative difference between $60,736 (the cost/value of the habilitation services) against $110,436 (the total cost of maintaining the living unit). Because $60,736 "is a substantial portion of the total cost of maintaining the living unit, that weighs in favor of it not being a private home." *Welding*, 353 F.3d at 1220.

"[T]he sixth [and final] factor is whether the service provider uses any part of the residence for the provider's own business purposes." *Id*. Although Incor did maintain desks, file cabinets, and store paperwork in some of the homes, its proposed findings and conclusions ignored the specific evidence with regard to specific residences.

-11-

Although the district court purported to conduct the home-by-home analysis required by *Welding*, in some respects it misstated the law and failed to apply the key factors to the relevant evidence. For example, instead of inquiring whether Incor's clients had previously lived in their current homes, as *Welding* prescribes, 353 F.3d at 1219, the court pointed instead to what it called "uncontradicted evidence at trial . . . that Incor's clients were always allowed to freely move into different residences and with roommates, if they so choose." Aplt. App., Vol. X at 5573. We have some doubts that the record supports this reading, but more importantly, it is a different question than that framed by our precedents. Similarly, the court found that Incor had no possessory interest in any of the units, *id.* at 5574, but did not explain how this analysis applied to the four units (2200 Turner Street, 901 Erie, 200 East Monroe, and 505 North G Street) for which Incor was listed as the tenant/lessee or responsible party. For a third example, *Welding* requires that the court determine whether the value of the services provided is a "substantial portion" of the total cost of maintaining the living unit. 353 F.3d at 1220. The district court, instead, looked to the proportion of total cost borne by the client, as opposed to the DHS. Aplt. App., Vol. X at 5575.

We therefore remand the case for new findings of fact in light of the law explained above. We also remind the court that Incor bears the burden of proving that these are private homes by a preponderance of the evidence.

-12-

## II. GENERAL HOUSEHOLD WORK

### A. The Statutory And Regulatory Framework

The employees' second claim was for overtime compensation based on the theory that even if they were working in private homes, they spent more than twenty percent of the total hours worked each week performing general household tasks. As a general rule, the FLSA requires payment of overtime compensation for employees who work more than forty hours per week. *See* 29 U.S.C. § 207. However, it provides an exemption to "any employee employed in domestic service employment to provide companionship services for individuals who (because of age or infirmity) are unable to care for themselves[.]" 29 U.S.C. § 213(a)(15). In turn, the DOL defines "companionship services" as

> those services which provide fellowship, care, and protection for a person who, because of advanced age or physical or mental infirmity, cannot care for his or her own needs. Such services may include household work related to the care of the aged or infirm person such as meal preparation, bed making, washing of clothes, and other similar services. They may also include the performance of general household work: *Provided, however,* [t]hat such work is incidental, *i.e.,* does not exceed 20 percent of the total weekly hours worked.

29 C.F.R. § 552.6.

Section 552.6 distinguishes household work related to the care of a client, which includes meal preparation, bed making, laundry, and other similar services, from general household work, which is unrelated to the care of the client. In *McCune v. Oregon Senior Services Division*, 643 F. Supp. 1444, 1450

(D. Or. 1986), *aff'd*, 894 F.2d 1107 (9th Cir. 1990), (interpreting Section 552.6

to determine whether the minimum wage requirement of 29 U.S.C. § 206 apply)

the court set forth the general test as

> [d]usting or cleaning [the client's bedroom or living room] appears to be routine, general household work, rather than work related to the individual. Cleaning a spill by the client in either room, by contrast, would be non-routine care more related to the individual than the general household, and would not be included in the twenty percent figure.
>
> The regulation defines care related to the individual as including meal preparation, bed making, washing of clothes and 'other similar services.' These similar services would presumably include other types of personal care, such as bathing, feeding, or cleaning spills.

Care related to the individual has been expanded to include more frequent

vacuuming and dusting for a client with allergies, mopping and sweeping for

clients who crawl on the floor, and habilitation training, which often includes

training the client to do housework, cooking, and attending to personal hygiene.

*See Terwilliger v. Home of Hope, Inc.*, 42 F. Supp. 2d 1231, 1241-42, 1253

(N.D. Okla. 1999).

### B. The Burden Of Proof

For the reasons explained in Section I, B, *supra*, Incor bears the burden of

proving its entitlement to this exemption under a remedial statute that must be

narrowly construed. The district court, however, imposed the burden of proof on

the employees. The court based its conclusion on language in *Terwilliger*,

42 F. Supp. 2d at 1252, that calls the "'20% rule' . . . an <u>exception</u> to the companionship services <u>exemption</u>." Aplt. App., Vol. X at 5578 n.17. This, however, does not shift the burden of proof. There is no "exception to an exemption" in 29 C.F.R. § 552.6; instead, the exemption is the "companionship services" exemption in 29 U.S.C. § 213(a)(15). Further, even if § 552.6 was an exception, the employer would still bear the burden of proof. *See, e.g., Acton v. City of Columbia*, 436 F.3d 969, 976 (8th Cir. 2006) (holding that "[t]he burden is on the employer to establish that the remuneration in question falls under an exception [to the FLSA];" *Johnson v. City of Columbia, S.C.,* 949 F.2d 127, 129-30 (4th Cir. 1991) (holding that "[e]xemptions from or exceptions to [the FLSA's] requirements are to be narrowly construed against the employer asserting them[,] and [s]ince the [employer] seeks to come within the . . . exceptions, the burden is on the [employer] to show that it is entitled to the benefits of those exceptions") (quotation omitted); *Donovan v. Brown Equip. & Serv. Tools, Inc.*, 666 F.2d 148, 153 (5th Cir. 1982) (same).

The district court also ruled, in the alternative, that it would rule in favor of Incor "even if [it] were to place the burden of proof regarding the 20% rule on [Incor]," Aplt. App., Vol. X at 5580. We are unable to review that alternative holding on this record. The relevant facts were disputed, and the court did not separately identify which factual conclusions rested on the erroneous allocation of the burden of proof. For example, the court rejected the employees' estimates of

-15-

how much time they spent on general household work because they did not "attempt[] to reconstruct through contemporaneous time records the amount of housework that he or she performed while serving as an HTS, whether the housework was related to the client or general in nature." *Id.* at 5537. The question, however, should have been whether Incor introduced sufficient evidence to establish that the exemption applied. The lack of contemporaneous time records could be relevant to the ultimate conclusion (assuming that such recordkeeping was required, which appears not to have been the case), but the district court erred in basing its conclusion on a defect in the employees' case rather than on the content of the employer's evidence. The court did not explain how, on this record, it could have reached the alternative holding that the employer it would rule in favor of Incor even if the employer bore the burden of proof.

We think it better to vacate this portion of the decision and allow the district court to undertake a fresh evaluation of the case in light of the proper burden of proof.

## III. TRAINING TIME

### A. The Statutory And Regulatory Framework

The employees' third claim was for regular wages for time spent in training classes under the theory that their attendance was involuntary. The FLSA obligates an employer to pay its employees for all hours worked. "Work" is not

defined in the FLSA, but an employee generally must be paid for his time that is controlled and required by the employer regardless of whether it involves any mental or physical exertion. *See* 29 C.F.R. §§ 785.1, 785.6, 785.7; *Armour & Co. v. Wantock*, 323 U.S. 126, 133 (1944). To that end, the DOL has promulgated regulations regarding training, including 29 C.F.R. § 785.27, which provides:

> Attendance at lectures, meetings, training programs and similar activities need not be counted as working time if the following four criteria are met:
> (a) Attendance is outside of the employee's regular working hours;
> (b) Attendance is in fact voluntary;
> (c) The course, lecture, or meeting is not directly related to the employee's job; and
> (d) The employee does not perform any productive work during such attendance.

The regulations further provide that training is not "voluntary" if an employee's "[a]ttendance . . . is . . . required by the employer. It is not voluntary in fact if the employee is given to understand or led to believe that his present working conditions or the continuance of his employment would be adversely affected by nonattendance." 29 C.F.R. § 785.28.

### B. The Burden Of Proof

An employer seeking to avoid application of the FLSA's general rule that work is compensable bears the burden of proving an exception. *Acton*, 436 F.3d at 976; *Johnson*, 949 F.2d at 129-30; *Donovan*, 666 F.2d at 153. For the reasons explained in Section I, B, *supra*, Incor bears the burden of proving its entitlement to this exemption under a remedial statute that must be narrowly construed.

-17-

## C. The Standard Of Review

The trial court's factual determinations are reviewed for clear error, *Sanders*, 112 F.3d at 470, but whether a given set of facts constitutes "work" under the FLSA is a question of law reviewed de novo. *Chao v. Tradesmen Int'l, Inc.,* 310 F.3d 904, 907 (6th Cir. 2002); *Birdwell v. City of Gadsden*, 970 F.2d 802, 807 (11th Cir. 1992). Further, "[w]hether the district court failed to consider or accord proper weight or significance to relevant evidence are questions of law [this court] review[s] de novo." *Flying J Inc.,* 405 F.3d at 829.

## D. Analysis

The DOL acknowledges that "[t]he ultimate decision on interpretations of the [FLSA] are made by the courts. 29 C.F.R. § 785.2. Nonetheless, because the agency "must determine in the first instance the positions [it] will take in the enforcement of [the FLSA]," the regulations "seek to inform the public of [the] positions" that it will take. *Id.* "[They] should thus provide a 'practical guide for employers and employees as to how the office representing the public interest in its enforcement will seek to apply [the FLSA].'" *Id.* (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 138 (1944)). Because 29 C.F.R. §§ 785.27 and 785.28 are interpretative regulations, the courts should defer to them only to the extent they have the power to persuade. *Skidmore*, 323 U.S. at 138. Similarly, the courts are not bound by informal administrative opinions; instead, "[i]nterpretations such as those in opinion letters – like interpretations contained in policy statements,

-18-

agency manuals, and enforcement guidelines, all of which lack the force of law –

do not warrant *Chevron*-style deference." *Christensen v. Harris County*, 529 U.S.

576, 587 (2000); *see also Rodriguez v. Whiting Farms, Inc.*, 360 F.3d 1180, 1189

(10th Cir. 2004).

Although the trial court erroneously afforded *Chevron* deference [6] to

§ 785.28 and an opinion letter concerning the child-care industry, we find these

sources persuasive under *Skidmore*, and therefore employ them in our analysis.

Section 785.28 provides that training is not "voluntary" if an employee's

attendance . . . is . . . required by the employer. It is not voluntary in fact if the

employee is given to understand or led to believe that his present working

conditions or the continuance of his employment would be adversely affected by

nonattendance." And the opinion letter states in relevant part that

> where a State requires employers to provide training as a condition of
> the employer's license to remain open for business – e.g., a day care
> center operator's license is conditional on all employees receiving a
> fixed number of hours of child care training each year. As the
> operator would typically require employees to attend such training, it
> would not be voluntary, and this criterion would not be met.

Opinion Letter from Dept. of Labor, Wage and Hour Div. (Sept. 9, 1996), 1996

WL 1031798.

Despite its length, the district court's analysis of this point, which was

adopted word-for-word from the employer's proposed findings, does not relate the

---

[6]    *Chevron* deference refers to *Chevron U.S.A., Inc. v. Natural Resources
Defense Council, Inc.*, 467 U.S. 837 (1984).

evidence to the legal standard. The evidence, as we discern it from the record, consisted of testimony from employees and Betsy Breen, and some documentary evidence. The employees testified that any employee who missed training faced removal from the work schedule or being fired. Ms. Breen testified that the consequences of the failure to attend training varied "depend[ing] on what the training was and how many times they missed it. If it was a first training and they'd missed it, then they just continued on their schedule. If it was a repeated failure to attend a required training, then they might be removed from the schedule." Aplt. App., Vol. X at 5608. The documentary evidence included a letter from Incor to an employee stating that she was "taken off the schedule due to not having [a required course]" and that she could only get back on the schedule when she "received a certificate." *Id.*, Vol. XVI at 8484. The district court does not explain how this evidence supports a conclusion that the training was voluntary, for purposes of § 785.28. We therefore vacate this portion of the decision and remand to the district court to evaluate the evidence in light of the regulatory criteria.

## IV.  *LIQUIDATED DAMAGES AND STATUTE OF LIMITATIONS*

### A.  *The Statutory And Legal Framework*

The employees argue that the trial court erred in granting Incor's motion for summary judgment as to liquidated damages and the application of a two-year statute of limitations to their claims. Because the court applied the wrong

-20-

definition of willfulness and misapplied the burden of proof as to liquidated damages, we reverse and remand the liquidated damages claim for further proceedings consistent with this order and judgment. We affirm the court's order applying a two-year statute of limitations.

Although a standard of willfulness applies to both liquidated damages and the statute of limitations under the FLSA, the definitions and burdens of proof differ for each. Ordinarily, an employer who violates FLSA is liable for both unpaid wages and an additional equal amount as liquidated damages. 29 U.S.C. § 216(b). To avoid such damages, the employer must show "to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the [FLSA]." 29 U.S.C. § 260. Good faith is a subjective test that requires "the employer have an honest intention to ascertain and follow the dictates of [the FLSA]." *Dep't of Labor v. City of Sapulpa*, 30 F.3d 1285, 1289 (10th Cir. 1994) (quotation omitted). Reasonableness "imposes an objective standard by which to judge the employer's behavior." *Id.* Only in those instances where the court finds that the employer meets this burden, it may, "in its sound discretion," deny liquidated damages. *Pabst v. Okla. Gas & Elec. Co.*, 228 F.3d 1128, 1136 (10th Cir. 2000); *see also City of Sapulpa*, 30 F.3d at 1289 (holding that even if the trial court finds that the employer acted in good faith and reasonably, it may still award liquidated damages).

A two-year statute of limitations applies to an action for unpaid wages under the FLSA, except where an employer acts willfully, in which case, a three-year period applies. 29 U.S.C. § 255(a). The employee bears the burden of proving that the employer acted willfully. *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 135 (1988); *see also Gilligan v. City of Emporia*, 986 F.2d 410, 413 (10th Cir. 1993). For purposes of the statute of limitations, "willful" means "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by [the FLSA]." *McLaughlin*, 486 U.S. at 133; *see also Reich v. Monfort, Inc.*, 144 F.3d 1329, 1334 (10th Cir. 1998).

### B. The Burden Of Proof

Summary judgment is proper if the pleadings, discovery materials, and any affidavits show that there is no genuine issue as to any material fact, and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). The district court must view the evidence and draw all reasonable inferences therefrom in the light most favorable to the nonmoving party. *In re Wal-Mart Stores, Inc.*, 395 F.3d 1177, 1189 (10th Cir. 2005). As part of this function the court may not make credibility determinations or weigh the evidence, and must disregard all evidence favorable to the moving party that the trier of fact is not required to believe. *Gossett v. Oklahoma*, 245 F.3d 1172, 1175 (10th Cir. 2001).

Summary judgment "necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits." *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 252 (1986). Therefore, a party opposing summary judgment who does not bear the burden of proof at trial, is not required to come forward with evidence to defeat summary judgment. On the other hand, where the nonmoving party bears the burden of proof at trial, he cannot rely on his pleadings to defeat summary judgment; instead, he must come forward with evidence sufficient to create a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Under either scenario, the moving party must demonstrate its entitlement to judgment as a matter of law.

### C. The Standard Of Review

"We review the district court's grant or denial of summary judgment de novo." *Gilligan*, 986 F.2d at 412. Applying the same legal standard as the district court and viewing the evidence in the light most favorable to the party opposing the motion, "[i]f there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law, summary judgment is appropriate." *Id*. (quoting Rule 56(c)).

### D. The Evidence On Summary Judgment

#### 1. Incor's Evidence

#### a. Edward Breen's Affidavit

Edward Breen attended a conference in Oklahoma in 1993 at which Joni Fritz, the executive director of the American Network of Community Options and Resources (ANCOR), was invited to speak. According to Mr. Breen, Ms. Fritz

-23-

told the group that the companionship services exemption "would apply to HTS services provided in the homes of the clients." Aplt. App., Vol. II at 1156-57. At or about the same time, Mr. Breen heard that another Oklahoma service provider, BIOS, had received confirmation from the DOL that HTS services "provided in the clients' homes was [sic] exempt from the FLSA overtime requirements." *Id*. at 1157. This news prompted him to contact the DOL, at which time he spoke to Steven Voss, who told him that "the [DOL] was treating HTS services as 'companions' under the FLSA and that HTS services were exempt from overtime requirement." *Id.*

In April 1994, the Oklahoma Department of Human Services, Developmental Disabilities Services Division (DDSD) sponsored a conference where Ms. Fritz was again invited to speak. "Once again, Ms. Fritz advised the service providers to utilize the companion exemption with respect to HTS services provided in the homes of the clients." *Id*. Mr. Breen revised Incor's HTS job description in 1995, to incorporate the companionship exemption. *Id*. at 1158.

### b. Joni Fritz's Affidavit

Joni Fritz was the executive director of ANCOR from 1976 through 1999. ANCOR is a "national organization whose purpose is to provide information and advice to organizations that support people with mental retardation and other developmental disabilities." *Id.*, Vol. III at 1354. She received a letter from the

-24-

DOL, "which informed us for the first time about the Section 13(a)(15) exemption for employees who provide 'companionship services.'" *Id.*

In 1993, in response to the closure of a state mental institution, Ms. Fritz was invited to speak at a conference in Oklahoma attended by Edward Breen, where she told the group that the companionship exemption "would apply to habilitation training services provided that those services were performed in the homes owned or leased by people with developmental disabilities who required support." *Id.* at 1355. In April 1994, Ms. Fritz returned to Oklahoma for another conference, which was again attended by Mr. Breen. Once again, she told the group that the exemption applied and "it was [her] impression that the State of Oklahoma officials were endorsing the use of the companionship exemption in order to provide better and more consistent services to people with developmental disabilities while reducing the state's operating costs." *Id.*

### c. The BIOS Form

Incor provided two pages from a 1991-93 DOL investigation of BIOS, a service provider in Oklahoma, titled "WHISARD Compliance Action Report." *Id.* at 1358. In the conclusions and recommendations section it states that it conducted an office audit for BIOS, which is under contract with the state to provide care for clients released from a state institution, and "13A15 Companion Services Applicable." *Id.* at 1359.

### d. Incor Memorandum

A June 28, 1993, memorandum from Edward Breen to Incor's employees memorializes his telephone conversation with DOL employee Steven Voss. In response to the employees' questions about overtime, Mr. Breen contacted the DOL, and Mr. Voss allegedly told him the DOL "is treating the HTS category under the heading of Companion." *Id*. at 1361.

### e. John Rowe's Affidavit

John Rowe worked as a case management supervisor for Oklahoma from 1983 through 1994. He attended the two conferences where Joni Fritz spoke about issues "affecting organizations that provide services to the developmentally disabled." *Id*. at 1364. He echoed that Ms. Fritz explained that "the overtime provisions of [FLSA] did not apply to individuals providing services like a [HTS] in the homes of the clients," *id.*, and that the "'companion exemption' allowed provider organizations to pay [HTSs] their regular hourly rate, regardless of the number of hours worked, when providing HTS/companion services." *Id.* Mr. Rowe opined that the state did not favor overtime pay because it would save money and provide more consistent care. Following Ms. Fritz's presentations and her "endorsement by state officials as an authority, many provider organizations began utilizing the companion exemption in the mid to early 90's." *Id.* at 1365.

## 2. *The Employees' Evidence*

The employees presented evidence showing what Incor did not do to investigate the propriety of relying on the companionship services exemption. Among other things, the employees' evidence established: (1) Incor never read a legal opinion concerning the companionship exemption; (2) Incor never sought the advice of a lawyer about the exemption; (3) prior to being sued, Incor never questioned its decision not to pay overtime; (4) prior to being sued, Incor was aware of lawsuits against other service providers but never inquired how those companies operated; (5) Betsy Breen never read any of the opinions in the lawsuits against other service providers; (6) Incor's auditors informed it that a lawsuit involving overtime and the exemption had gone to court; and (7) employee Kent Fowler was "told to cut shifts down to 40 hours where possible," *id.*, Vol. VIII at 4415, so Incor could "avoid a lawsuit." *Id.*, Vol. IX at 4981-82.

## E. *Analysis*

Regarding the statute of limitations, we apply the same standard as the district court and review whether the employees' evidence, viewed in the light most favorable to them, was sufficient to create a genuine issue of material fact as to whether Incor acted willfully, i.e., whether it "either knew or showed reckless disregard for the matter of whether its conduct was prohibited by [the FLSA]." *McLaughlin*, 486 U.S. at 133; *see also Gilligan*, 986 F.2d at 413. We agree that the evidence failed to create a triable issue of fact and that Incor was entitled to

-27-

judgment as a matter of law. Although cases involving knowledge, motive, and/or intent are not well suited to summary disposition, *Baum v. Great W. Cities, Inc.*, 703 F.2d 1197, 1210-11 (10th Cir. 1983), this does not mean that summary judgment is never proper. Instead, the evidence, viewed in the light most favorable to the employees, showed that Incor relied on the advice of industry consultants and state officials in implementing a policy that was in widespread use in Oklahoma and elsewhere. Admittedly, Incor did not consult a lawyer or investigate the lawsuits against other service providers, however this is not enough to prove recklessness. Therefore, we affirm the court's summary judgment order for the application of a two-year statute of limitations.

As to liquidated damages, the district court erred because it applied the test of willfulness used for the statute of limitations and reasonableness and placed the burden of proof on the employees. Aplt. App., Vol. IX at 4984. Because the trial court misapplied the law, we remand the issue of liquidated damages for further proceedings consistent with this order and judgment. For Incor to obtain summary judgment, the material facts must be undisputed and establish its right to judgment as a matter of law. This means that Incor must satisfy the subjective test of good faith that requires "an honest intention to ascertain and follow the dictates of [the FLSA]," *City of Sapulpa*, 30 F.3d at 1289 (quotation omitted), and the objective test of reasonableness. *Id*. Even if Incor meets this burden, the court may in its discretion award liquidated damages. *Id*. If the issue cannot be resolved on

-28-

summary judgment, the court is directed to conduct a hearing to determine whether liquidated damages are appropriate. We also remind the court that it may not make credibility determinations on summary judgment, *Gossett,* 245 F.3d at 1175, and thus must disregard any credibility determinations made at trial to shore up its summary judgment order.[7]

### V. CONCLUSION

We **AFFIRM** the trial court's order applying a two-year statute of limitations to the employees' claims. We **VACATE** the court's findings of fact and conclusions of law and **REVERSE** its order on summary judgment denying the employees' claim for liquidated damages, and **REMAND** the case for further proceedings consistent with this order and judgment.

Entered for the Court

Michael W. McConnell
Circuit Judge

---

[7] The trial court's findings of fact and conclusions of law comment on the credibility of Edward Breen and Betsy Breen. In particular, the court noted that even if they violated the FLSA, it "would be wholly incapable, after observing their testimony and demeanor on the witness stand, of believing such violations resulted from bad faith, malicious intent or even wilful (sic) negligence[.]" Aplt. App., Vol. X at 5498-99.